GEORGE A. McLAUGHLIN & another, trustees in bankruptcy,
vs. NEW ENGLAND TELEPHONE AND TELEGRAPH
COMPANY & another.

Suffolk.    December 7, 1962. — March 6, 1963.

Present: WILKINS, C.J., CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Assignment.   Contract,* Building contract.   *Waiver.   Equity Jurisdiction,*
Interpleader.   *Words, "Account."*

Certain assignments given to a bank by a contractor who was a party to
a building contract were each interpreted as covering only a payment
in a specific amount due to the contractor under the contract as of a
particular date for particular items already performed or furnished by
him.   [559–560]

Provisions of a building contract requiring certificates of the architect
prior to the making of payments by the owner and prohibiting assign-
ments of money due the contractor without the consent of the owner
were for the benefit of the owner, who ceased to insist upon observance
of such provisions when, pursuant to a consent decree in a suit in equity,
he paid into court a sum owed by him under the contract for disposition
as between trustees in bankruptcy of the contractor and an assignee of
the contractor, and thereby effected an informal interpleader.   [557,
558, 563–564]

Subject only to the rights of the owner under provisions of a building
contract requiring certificates of the architect prior to payments by the
owner and prohibiting assignments of money due the contractor without
the owner's consent, a written assignment by the contractor to a creditor
of a specific amount already earned by the contractor, even if not then
payable, constituted a completed assignment of an "account" within
G. L. c. 107A, §§ 1, 2; and, when subsequently the owner paid such
amount into court and ceased to insist upon observance of such provi-
sions of the contract, the assignee became entitled to such amount as
against trustees in bankruptcy of the contractor.   [564–566]

BILL IN EQUITY filed in the Superior Court on April 8,
1959.

The suit was heard by *Tauro, J.*

*Jules E. Angoff (Walter J. Hurley* with him) for the
United States Trust Company.

*John C. Kane* for the New England Telephone and Tele-
graph Company.

*M. Arthur Gordon (Julius Thannhauser* with him) for
the plaintiffs; *Daniel B. Bickford,* Assistant United States
Attorney, also with him.

CUTTER, J.   This is a bill in equity, filed by the trustees in bankruptcy (the bankruptcy trustees) of Charles A. Mogavero Co., Inc. (Mogavero), for declaratory relief concerning a fund of $63,758.44 paid into court by the telephone company (Telephone).   The fund is claimed by the bankruptcy trustees and by United States Trust Company (the bank) under purported assignments to it by Mogavero.   An involuntary petition in bankruptcy was filed against Mogavero on January 24, 1958, upon which Mogavero was adjudicated a bankrupt.   An interlocutory decree, entered by consent on October 17, 1960, directed Telephone to pay the fund into court.   The parties filed a statement of agreed facts.[1]   By the final decree it was ordered that the whole fund be paid to the bankruptcy trustees.   The bank appealed.

Mogavero from 1955 through 1957 made five construction contracts[2] with Telephone.   Two contracts were on a lump

[1] The United States of America intervened to enforce certain tax liens against Mogavero, notices of which were filed in the Boston city clerk's office on December 27, 1957.   It has been stipulated that no finding (see fn. 8, *infra*) is to be made as to the rights of the United States in the event that payment of the fund to the bankruptcy trustees is ordered.   The United States has not appealed from the final decree.   Upon motion of Telephone, process was issued joining certain subcontractors or suppliers of Mogavero as additional parties.   All intervention petitions filed by these persons have been dismissed, because the interveners had elected to prove claims in the bankruptcy court for the amounts owing to them respectively.

[2] The facts as to these contracts may be summarized:

| Contract and Date | Work not done Sept. 17, 1957 | Amount paid into court under interlocutory decree Oct. 17, 1960 | Purported Assignments—Dates of Accounts |
|---|---|---|---|
| HINGHAM Oct. 26, '56 (Lump sum) | Elevator work incomplete. Miscellaneous other items to be corrected. Various suppliers and subcontractors unpaid. | $43,280.93 | 6/4/57 — $2,525.27, 7/12/57 and 7/10/57 — $4,404.80 and 7/24/57 — $50,362.59 |
| 245 STATE ST. Boston Mar. 19, '56 (CPFF) | Work completed June 1, 1957. Balance of Mogavero's fee unpaid — $668.36 | 668.36 | 8/9/57 — $668.36, 8/30/57 — $4,500.00, 9/6/57 — $5,841.78 (not clear that this assignment refers to this contract). |
| EAST BOSTON Nov. 7, '55 (Lump sum) | Work completed. Balance of price unpaid — $2,087.51 | 2,087.51 | 5/28/57 — $1,920.00 |

sum basis. Three were on a cost plus a fixed fee (CPFF) basis. Each contract provided (art. 33 of the general conditions), "Neither party . . . shall assign the contract . . . without the written consent of the other, nor shall the contractor assign any moneys due or to become due to him hereunder, without the previous written consent of" Telephone.

During the period May 31 to September 18, 1957, Mogavero borrowed substantial sums from the bank, and gave to the bank demand collateral notes, which bore the personal endorsement of the treasurer of Mogavero. As of September 18, 1957, $70,000 remained due from Mogavero to the bank.

Mogavero executed and delivered to the bank instruments on "accounts receivable assignment forms of the bank" simultaneously with some of the notes. Each such assignment purported to assign certain accounts described on the reverse of each instrument, where, under the title "Accounts Assigned," appear (a) the dates of the accounts assigned, (b) the name of Telephone as the debtor (with, in each case, usually a somewhat blind reference to the particular contract), (c) the amount of each account, and (d) at the bottom of the sheet, a statement of the "loan against this schedule." These assignments extended from May 28 through September 11, 1957, and the aggregate amount attempted to be assigned by these instruments was in excess of $100,000.

On September 24, 1957, the bank wrote to Telephone that it held "assignments of [the] contracts and all receivables arising thereunder" and requested Telephone to "make all payments to" it. Mogavero wrote to Telephone that the "monies due us" on the contracts "have been assigned to

| | | | |
|---|---|---|---|
| 10 WARE ST. Cambridge Apr. 6, '56 (CPFF) | Work completed June 1, 1957. Balance of Mogavero's fee unpaid — $920.22 | 920.22 | 5/28/57 — $937.92, 8/9/57 — $937.92 |
| 175 ADAMS ST. Dorchester Apr. 30, '57 (CPFF) | Various subcontractors unpaid but work completed. | 16,801.42 | 5/31/57 — $8,574.09, 8/21/57 — $9,338.00, 9/6/57 — $15,810.51 |

the" bank, and authorized payments direct to the bank. Telephone replied refusing consent and calling attention to art. 33 of each contract. Telephone never consented to any assignment unless the interlocutory decree of October 17, 1960, "is by implication an assent."

Mogavero, upon receiving checks from Telephone, delivered them to the bank to apply to Mogavero's debt. Telephone "had no notice or knowledge of this practice." There is no other evidence, than that summarized above, of what sums were due from Telephone to Mogavero as of the dates of the purported assignments, respectively, which (as already noted) purported to assign specified accounts then due. "In no instance . . . was there an architect's certificate for payment of any part of the sum remaining unpaid" under any of the five contracts. Such a certificate was contemplated by arts. 24, 25, and 26 of the general conditions of each lump sum contract.[3] Comparable provisions for architect's certificates were contained in each CPFF contract.[4]

The trial judge in his order for a decree ruled that the bank and Mogavero were bound by art. 33 of the general

---

[3] Article 24 required Mogavero to submit to the architect "an application for each payment" (including, of course, progress payments). If (art. 25) "the contractor has made application . . . the architect shall . . . issue . . . a certificate for such amount as he decides to be properly due, or state . . . his reasons for withholding a certificate. . . ." Article 26 provides that the architect "may withhold . . . any certificate . . . to protect the owner from loss on account of: (a) Defective work . . . . (b) Claims filed . . . [or probable]. (c) Failure of the contractor to make payments . . . to subcontractors . . . . (d) A reasonable doubt that the contract can be completed for the balance then unpaid. . . ." The architect was to inspect the work (arts. 4 and 5 of the contract) and issue a final certificate, after the contractor had shown "that all payrolls, material bills, and other indebtedness . . . have been paid." If Mogavero (art. 21, general conditions) should fail to perform any contract provision, Telephone, after notice to Mogavero, could "make good such deficiencies and . . . deduct the cost . . . from the payment then or thereafter due" subject to the architect's approval.

[4] The contractor was to deliver each month to the architect "a statement . . . showing in detail . . . all moneys paid out by him on account of the cost of the work during the previous month." The architect was to "check the . . . statements . . . and . . . promptly issue certificates to the owner for all such as he approves, which certificates shall be payable on issuance." The undertaking of Telephone, under these (CPFF) contracts, was "to reimburse . . . [Mogavero] all costs . . . incurred for the . . . work and paid directly by" Mogavero. Telephone, after notice to Mogavero, could pay directly any bill left unpaid by Mogavero for "five days after it falls due."

conditions of the contracts with Telephone, and that Telephone "did not waive the provisions of" art. 33 by assenting to the interlocutory decree of October 17, 1960. He stated that he was "not satisfied" (a) that at the time of the bankruptcy petition there were due from Telephone to Mogavero the sums of money Mogavero had attempted to assign to the bank, or (b) "that, at the time various assignments were attempted by . . . Mogavero . . . to the" bank, the sums so assigned "were due from . . . Telephone . . . to Mogavero."

The bank contends that it is entitled to the fund by virtue of Mogavero's assignments to it. The bankruptcy trustees contend, among other things, (a) that the assignments were invalid because of art. 33, (b) that, when the assignments were made, there were no accounts in existence to be assigned, and (c) that no assignments of future accounts, or of money to become due, were made.[5]

1. Mogavero by each assignment purported to assign to the bank "the claims, or the accounts receivable, . . . contracts, and . . . other choses in action . . . collectively referred to as 'the accounts' . . . described in" the assignment form. It also warranted, among other things, that the account represented "a bona fide sale," that the account assigned was "owing to" Mogavero, that there existed no offset thereto, and that any check, due on the accounts, which should "come to" Mogavero would be accepted as the bank's property "and be immediately transferred to the . . . [bank] in the same form in which . . . received."

We find in the assignment forms and in the collateral note forms no sufficient indication of any intention to assign either (a) the contracts themselves, or (b) money to become due in the future under the contracts, except, perhaps, money later payable because of the specific items mentioned in the schedule, where the items are described very briefly and ambiguously. We interpret each assignment as covering only the payment for the particular work performed or

---

[5] All the transactions and the filing of the bankruptcy petition against Mogavero took place before October 1, 1958. Accordingly, the Uniform Commercial Code (now G. L. c. 106) is not applicable. See St. 1957, c. 765, § 21.

other items furnished, referred to in the schedule on that assignment, stated to be due under a specified contract, as of a particular date, and in a specific amount. If a broader assignment had been intended, appropriately broad, explicit, descriptive language should have been used in the schedules. There is thus no occasion for us to consider what the situation would have been if the assignments adequately had referred to money due, or to become due, under a particular contract or contracts. Cf. *Claycraft Co.* v. *John Bowen Co.* 287 Mass. 255, 257 ("money due and to become due" under a particular contract); *Great Am. Indem. Co.* v. *Allied Freightways, Inc.* 325 Mass. 568, 570–571; *Manchester Natl. Bank* v. *Roche,* 186 F. 2d 827, 829 et seq. (1st Cir.); Pomeroy, Equity Jurisprudence (5th ed.) § 1283.

The facts vary somewhat from contract to contract. See fn. 2, *supra.*

(a) *245 State Street, Boston, and 10 Ware Street, Cambridge.* Work on these CPFF contracts was completed on June 1, 1957. The only money paid into court, allocable to the State Street contract, was $668.36, the unpaid balance of Mogavero's fixed fee. This was listed on an assignment dated August 9, 1957, along with $937.92, which probably is an overstatement of the fixed fee balance ($920.22) on the Cambridge contract, in fact the only money later paid into court on that contract. The $937.92 item had previously been listed on an assignment dated May 28, 1957. The record does not disclose any offset to these amounts, or that any more was due[6] on these contracts respectively. The assignment of August 9, 1957, we regard as intended to transfer, so far as Mogavero could, all Mogavero's rights to payment of the $668.36 unpaid balance on the State Street contract, and as unaffected by Mogavero's attempted assignment (see fn. 6, *supra*) on August 30, 1957, of $4,500. We infer that the assignments of May 28, 1957, and August 9, 1957, of $937.92 refer to the $920.22 balance of fixed fee

---

[6] On August 30, 1957, Mogavero purported to assign $4,500 more as payable under the State Street contract. That no such sum was paid into court by Telephone suggests that no such sum was then due or, if due, that Telephone subsequently had paid it.

on the Cambridge contract, which Telephone later paid into court, although no invoice or other document identifies the item.

(b) *East Boston.* The work on this lump sum contract had been completed as of September 17, 1957, but the record does not show how much earlier. There was then unpaid $2,087.51 of the contract price. On May 28, 1957, Mogavero purported to assign $1,920 as due under this contract, but without further identification by invoice or otherwise. In the absence of indication of any dispute about what had been earned upon this contract, we infer that the assignment of May 28, 1957, was intended to transfer to the bank a security interest in $1,920 of the slightly larger amount remaining unpaid under the East Boston contract.

(c) *175 Adams Street, Dorchester.* There are "no items which . . . Mogavero . . . had failed to perform" under this CPFF contract. The record does not show when work was finished. Telephone has paid into court $16,801.42 on account of this contract. Of this sum $11,368.51 represents "work, labor, and materials of Mogavero's subcontractors who have not been paid." $3,544.21 represents work by Mogavero. $1,888.70 is the unpaid portion of the fixed fee.

Mogavero was not entitled, on the date of any purported assignment of amounts payable under this contract, to any part of the $11,368.51 for work and materials of Mogavero's still unpaid subcontractors. Telephone's obligation (see fn. 4, *supra*) was only to "reimburse" Mogavero. The bank has not shown that any assignment to it of an amount under the Dorchester contract was adequately identified as then owing or that it was an item for which any part of Telephone's payment into court was made. We hold (without considering the effect of art. 33 of the general conditions or the absence of the architect's certificates) that the record fails to disclose that any one of these assignments was effective at all, because there is no showing of any indebtedness of Telephone, existing on the date of the assignment, to which could apply such a purported assignment of amounts then earned by Mogavero.

(d) *Hingham.* On September 17, 1957, various items had not been completed on this lump sum contract. The principal deficiency related to the elevator electric wiring. As of that date Telephone had paid a substantial amount to Mogavero for work done by subcontractors. Mogavero had held back from them a large part of this. Litigation by Westinghouse Electric Corporation (Westinghouse), the elevator subcontractor, was settled, after the date of the bankruptcy petition and with the consent of the bankruptcy trustees, by direct payment of $9,463.85 by Telephone to Westinghouse under art. 21 (see fn. 3, *supra*) for completing the subcontract, which it did about December 2, 1958. Telephone has paid $43,280.93 into court in respect of this contract pursuant to the interlocutory decree of October 17, 1960. This payment, added to the direct payment to Westinghouse ($9,463.85), makes a total payment of $52,744.78. There is no showing that the subcontractors, who on September 17, 1957, had not been paid, were ever paid by Mogavero the amounts owing to them. There is no adequate correlation between amounts assigned and amounts shown by the record to be due on September 17 or on any other date. The bank also has not established that, at least up to the date of the bankruptcy petition, (a) Telephone could not have invoked the provisions of art. 21 of the general conditions (see fn. 3, *supra*) and itself performed any work not done properly, or (b) that the architect would not have been free to deny a certificate under art. 26 because of Mogavero's failure to pay subcontractors. Claims for payment, in fact subject to such uncertainties, were not sufficiently established in amount and sufficiently clearly owing to be transferred by assignments which we interpret as covering only amounts then due.

We hold that the assignments, in any event, did not transfer to the bank any interest in any amounts, other than (a) the balance of fixed fee under the State Street contract, $668.36; (b) the fixed fee balance under the Cambridge contract, $920.22; and (c) $1,920 of the amount ($2,087.51) paid into court on account of the East Boston contract. There

is no occasion for further consideration of any amounts other than these sums.

2. Article 33 of the contracts was valid. *Federal Natl. Bank* v. *Commonwealth*, 282 Mass. 442, 450. *Security Natl. Bank* v. *General Motors Corp., ante,* 434, 442, and cases cited.[7] This prohibition of assignments, however, was for the benefit of Telephone and did not prevent an assignee (under an assignment otherwise valid) from acquiring rights against the assignor, subject, however, to Telephone's interest in enforcing the prohibition. See *Jennings* v. *Whitney,* 224 Mass. 138, 143; *Commercial Cas. Ins. Co.* v. *Murphy,* 282 Mass. 100, 105–106; *Russo* v. *Charles I. Hosmer, Inc.* 312 Mass. 231, 235; Restatement: Contracts, § 176; Williston, Contracts (3d ed.) § 422, p. 140; Corbin, Contracts, § 873, p. 496. See also *Staples* v. *Somerville,* 176 Mass. 237; *In re Bresnan,* 45 F. 2d 193, 197–198 (D. Md.). Cf. *Federal Natl. Bank* v. *Commonwealth,* 282 Mass. 442, 450–451.

It is stipulated that, apart from the events attendant upon the interlocutory decree of October 17, 1960 (entered long after Mogavero became bankrupt), Telephone "at no time consented . . . to any assignment" of monies due from it to Mogavero. Telephone, by paying the fund into court, recognized that it owed the money to someone, and obtained (a) the consent of all interested claimants to a statement of the liability and (b) an effective bar to the collection from it of any further sum and to the running of interest. Telephone thus ceased to assert its right to have the architects' certificates before making any payments. Similarly, it ceased to have standing to rely upon art. 33, for it had in effect agreed that the court should be stakeholder of a fund to which Telephone no longer had any claim. The interlocutory decree effected an informal interpleader. See *Savage* v. *McCauley,* 301 Mass. 162, 164–165. See also *Conway* v. *Kenney,* 273 Mass. 19, 22; *Coch-*

---

[7] See Restatement: Contracts, § 151 (e); Parker and Adams, The A. I. A. Standard Contract Forms and the Law, p. 50. Cf. Uniform Commercial Code, G. L. c. 106, § 9–318 (4), inserted by St. 1957, c. 765, § 1, as to transactions after October 1, 1958.

*rane* v. *Janigan,* 344 Mass. 296, 302; *Freeny* v. *Bauern-schmidt,* 33 F. 2d 709, 712–713 (4th Cir.). Telephone could then have been discharged as a party. See *Connecticut Mut. Life Ins. Co.* v. *Allen,* 235 Mass. 187, 189. At least until the date of the bankruptcy, however, Telephone remained free to pay directly to Mogavero, without regard to the assignments, any amount owed by it under the contracts, and to insist, for its own protection, upon the architect's certificates (see fns. 3 and 4, *supra*) before making payments.

3. General Laws c. 107A (inserted by St. 1945, c. 141, but repealed by St. 1957, c. 765, § 2, except as to transactions prior to October 1, 1958, see § 19), governed the assignment of any items shown to be owing on the date of the assignment. Chapter 107A, § 1, defined ''account'' as ''an account receivable.'' The term includes ''sums owing, *although not yet payable,* under an existing contract, but not sums to become due for goods not yet completed or services not yet rendered'' (emphasis supplied). See Craig, Accounts Receivable Financing, 65 Harv. L. Rev., 627, 629–631; 42 B. U. L. Rev. 187, 190. Section 2 provided that an ''assignment of an account transfers from . . . [its] date . . . all rights which the assignor *has power to transfer* and shall . . . be deemed to be . . . fully perfected as of the date it is made'' (emphasis supplied), if in writing and for value and if the assignee takes in good faith, ''whether or not . . . the account debtor assents to the assignment.'' We do not interpret the provision last cited as making invalid art. 33 of the several contracts, in the absence of a clear statement to that effect such as is found in § 9–318 (4) of the Uniform Commercial Code (see fn. 7, *supra*). See comments, Mass. Ann. Laws, Spec. Supp. 1958 (c. 106), pp. 827–829. We interpret §§ 1 and 2 as applying only to ''true accounts receivable [where] the assignor has performed and nothing remains to be done in the transaction except the payment of the agreed price by the account debtor.'' See Malcolm, Explanation and Analysis of St. 1945, c. 141, 30 Mass. L. Q. (No. 2) 26, 34–35. Cf. *Aetna Cas. & Sur. Co.* v. *Harvard Trust Co.* 344 Mass. 160, 176–177.

We think that, as between the bank and Mogavero, the three amounts ($668.36, $920.22, and $1,920) still under discussion were "accounts" within G. L. c. 107A, § 1, as "sums owing," which, subject to any rights Telephone might assert, Mogavero had "power to transfer" (see c. 107A, § 2) despite the requirement of an architect's certificate. Even if "not yet payable" when assigned, the amounts assigned would be "accounts" under § 1. Upon the agreed facts, these items had been earned. The purpose of the architect's certificate was only to verify that fact for Telephone's protection, and a certificate could hardly have been refused on the agreed facts. See Corbin, Contracts, §§ 650–652, 756. See also Restatement: Contracts, § 303. Cf. *G. L. Rugo & Sons, Inc.* v. *Lexington,* 338 Mass. 746. Accordingly, under G. L. c. 107A, § 2, these assignments were complete when made, subject only to Telephone's rights under art. 33 and its right to require the architect's certificate, each for its own protection.

Such an assignment of an account was, under § 2, one as to which "no existing or future creditor of the assignor . . . [could] acquire any . . . lien . . . superior to or in diminution of the rights of the assignee." This provision was framed to meet the supposed requirements of the 1938 amendment of § 60 (a) of the Bankruptcy Act, discussed in the article already cited, 30 Mass. L. Q. (No. 2) 26, 28–34. See also Collier, Bankruptcy, § 60.38; Braucher and Sutherland, Commercial Transactions (2d ed.) 149–152, 166–174. Such an assignment under c. 107A, § 2, seems to us to satisfy the requirements of the 1950 amendment of § 60 (a) (2), now found in 11 U. S. C. § 96 (a) (2) (1958), as one "so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee."

We recognize that, with respect to unallowed claims against the United States, Federal courts have reached a different conclusion. See *Matter of Ideal Merc. Corp.* 244 F. 2d 828, 832 (2d Cir.), cert. den. sub nom. *Ideal Merc. Corp.* v. *Gallant Fabrics, Inc.* 355 U. S. 856. See also *Mayo*

v. *Pioneer Bank & Trust Co.* 270 F. 2d 823, 834 (5th Cir.), cert. den. 362 U. S. 962; *Matter of Sussman,* 289 F. 2d 76, 78 (3d Cir.). We view, however, the *Ideal Merc. Corp.* case and similar decisions as resting upon the statutory policy against assignments of such unallowed claims expressed in the Assignment of Claims Act, 31 U. S. C. § 203 (1958). Cf. *Martin* v. *National Sur. Co.* 300 U. S. 588, 596–598. The policy behind c. 107A seems to us to be different. It tends to support the early perfection of assignments made in compliance with its provisions. See *Costello* v. *Bank of Am. Natl. Trust & Sav. Assn.* 246 F. 2d 807, 809–813 (9th Cir.), in which weight was given to the remedial purpose of statutes (like c. 107A) in aid of ''non-notification financing of accounts receivable.'' See also *Blackford* v. *Commercial Credit Corp.* 263 F. 2d 97, 104–105 (5th Cir.), cert. den. 361 U. S. 825. Cf. *Miami Natl. Bank* v. *Knudsen,* 300 F. 2d 289, 290–296 (5th Cir.).

4. The final decree is to be modified to declare the rights of the parties in accordance with this opinion and to order that there be paid (a) to the bank the aggregate sum of $3,508.58 ($668.36 plus $920.22 plus $1,920) and (b) to the bankruptcy trustees the balance of the principal amount paid into court by Telephone pursuant to the interlocutory decree of October 17, 1960. The interest, if any, earned upon the deposited fund is to be apportioned between the bank and the bankruptcy trustees in proportion to the principal amounts payable to them respectively.[8] No costs of this appeal are to be paid to any party.

*So ordered.*

---

[8] Although the matter is not precisely covered in the stipulation referred to in the trial judge's order for a decree (see fn. 1, *supra*) there is no occasion for determining the rights of the United States of America upon this appeal. The part of the fund payable to the bankruptcy trustees (exclusive of any interest, more than $60,000) greatly exceeds the taxes claimed by the United States ($22,233.28 plus interest).