[Civ. No. 29726. First Dist., Div. Four. Sept. 29, 1972.]

RICHMOND CRANE RIGGING AND DRAYAGE CO., INC.,
Plaintiff and Respondent, v.
LIBERTY NATIONAL BANK, Defendant and Appellant.

[Civ. No. 29814. First Dist., Div. Four. Sept. 29, 1972.]

SUPERIOR CONCRETE ACCESSORIES, INC.,
Plaintiff and Respondent, v.
LIBERTY NATIONAL BANK, Defendant and Appellant.

(Consolidated Cases.)

## COUNSEL

Anixter & Aronson, Henry Cohen, Arthur P. Shapiro, Robert D. Raven, Paul E. Homrighausen, James H. De Meules and Morrison, Foerster, Holloway, Clinton & Clark for Defendant and Appellant.

Tinning & DeLap, Jay P. Sanders, Janvier & Rutledge and Robert S. Rutledge for Plaintiffs and Respondents.

## OPINION

**BRAY, J.**\*—In consolidated cases whereby the court entered separate judgments against appellant and in favor of each of the respondents, appellant appeals from each judgment.[1]

### Questions Presented

1. Was appellant's security interest represented by the December 7, 1966, contract perfected?

2. Are the moneys represented by the Huber checks Kelly accounts receivable?

### Record

Kelly Bros. Cranes and Rigging (Kelly) was a corporation engaged in the business of hoisting precast concrete panels for installation on improvements to real property. Golden Gate National Bank (Bank), now

---

\*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1]The appeal in each case has been briefed and heard together.

known as Liberty National Bank by reason of its consolidation with the First National Bank of Vista in 1967, was a National Banking Association organized and existing under and by virtue of the laws of the United States of America.

By agreement dated August 10, 1966, Kelly entered into a security agreement with Bank whereby Bank agreed to advance sums to Kelly in return for a security interest in Kelly's receivables. A financing statement naming Kelly as debtor was filed with the Secretary of State of California on August 11, 1966, which financing statement remained of record as of the date of trial. On December 7, 1966, Bank and Kelly executed another security agreement identical to the August 10, 1966, agreement, except that the figure "$125,000" in the August agreement was changed to "$150,000" in the December agreement, and that Kelly agreed to deliver to appellant continuing guarantees from its principals in the amount of $150,000 rather than $125,000 as provided in the August 10, 1966, security agreement. A financing statement naming David Hellman, the principal shareholder of Kelly, as debtor was filed with the Secretary of State of the State of California on April 24, 1967, which financing statement remained of record as of the date of trial. (Sheldon Solloway, a then employee of Bank, explained that the reason for the filing of the financing statement naming David Hellman as debtor was that, because of bonding requirements, one of Kelly's general contractors required that Mr. Hellman accept the job personally and Mr. Solloway wanted to be sure that Bank's interests were protected.)

Pursuant to the aforesaid security agreements, Bank advanced considerable funds to Kelly over a period of time, all of which were used in the operation of Kelly's business and in payment of its creditors. Except for its security interest in the Kelly accounts receivable Bank was unsecured.

On December 7, 1965, Huber, Hunt & Nichols, as general contractor, entered into a contract with the Department of the Navy for the construction of an addition to the Oak Knoll Hospital in Oakland, California, an improvement project on a United States Naval Hospital, which hospital was, and is, a federal installation, and which work of improvement was subject to the provisions of 40 United States Code, section 270a et seq., commonly known as the Miller Act. On January 10, 1966, Huber, Hunt & Nichols entered into a subcontract with Grassi-American Corporation and Grassi-American Corporation in turn entered into a subcontract with Kelly. It is stipulated by the parties that on the Oak Knoll

job the general contractor was Huber, Hunt & Nichols, that Grassi-American Corporation was a subcontractor of Huber, Hunt & Nichols, that Kelly was a subcontractor of Grassi-American Corporation. Richmond and Superior were subcontractors of Kelly on the Oak Knoll job.

Superior commenced its work on September 12, 1966, and completed on May 12, 1967, and there is due Superior from Kelly the sum of $14,281.89. Superior performed its services pursuant to an agreement made between Superior and Kelly subsequent to August 10, 1966.

Richmond commenced its work on September 12, 1966, and completed on April 7, 1967, and there is due Richmond from Kelly the sum of $21,027. Richmond performed its services pursuant to an agreement made between Richmond and Kelly subsequent to August 10, 1966.

On April 19, 1969, Superior filed a claim under the Miller Act with the general contractor (Huber, Hunt & Nichols), the Department of the Navy and the United States Fidelity and Guaranty Company. Other than presenting the claim, Superior took no further action relative thereto. On May 4, 1967, Richmond filed a claim under the Miller Act with the general contractor (Huber, Hunt & Nichols), the Department of the Navy and the United States Fidelity and Guaranty Company. Other than presenting the claim, Richmond took no further action relative to said claim. A check of Huber, Hunt & Nichols, of date June 16, 1967, in the sum of $12,281.89, was issued payable to Grassi-American Corp., Kelly, Bank, and Superior. A check of Huber, Hunt & Nichols, of date June 16, 1967, in the sum of $21,027, was issued payable to Grassi-American Corporation, Kelly, Bank, and Richmond. Each of the aforesaid checks was deposited in Liberty National Bank without prejudice to the adverse claims of Superior, Richmond and Bank. These checks represented the balance due Kelly for work performed under its contract with Grassi-American on the Oak Knoll job.

At the time of trial, Kelly Bros. had no outstanding uncollected accounts receivable. The aforesaid checks were included as part of the credit of the Bank's claim against Kelly and the Bank's claim against Kelly would become revived to the extent that any portion thereof would have to be paid to either Richmond or Superior.

The court found that the second security agreement superseded and extinguished the first, and that the second agreement was never perfected because no new financing statement was filed.

### 1. *Effect of failure to file additional statement.*

■ Section 9201 of the Commercial Code provides that "Except as otherwise provided by this code a security agreement is effective according to its terms between the parties . . . against creditors. . . ."

Commercial Code section 9203 provides that "a security interest is not enforceable against the debtor or third parties unless (a) The collateral is in the possession of the secured party; or (b) The debtor has signed a security agreement which contains a description of the collateral . . ." Only subdivision (b) is relevant herein.

Commercial Code section 9302, subdivision (1) requires that, in order for a security interest to be perfected, a financing statement must be filed. Exceptions are provided where no such statement is required. (See Com. Code, § 9302, subd. (1)(a)-(h).) Subdivision (1)(g) makes an exception where the security interest is in general intangibles. A "general intangible," for purposes of the aforementioned section, is "any personal property (including things in action) other than goods, accounts, contract rights, chattel paper, documents, and instruments. . . ." (Com. Code, § 9106.) Consequently, an account receivable is not, under the aforementioned subdivision, one of the interests for which filing of a financing statement is not required for purposes of perfecting the interest. In addition, there is no further exception to filing made in the code for perfection of a security interest in an account receivable.[2]

Section 9402, subdivision (1), provides: "A financing statement may be filed before a security agreement is made or before a security interest otherwise attaches." Section 9403, subdivision (2), provides that a financing statement is effective for five years. The section does not require a financing statement to refer to any security agreement.

Commercial Code section 9402, defining the formal requisites of a financing statement, "adopts the system of 'notice filing' which has proved successful under the Uniform Trust Receipts Act. What is required to be filed is not, as under chattel mortgage and conditional sales acts, the security agreement itself, but only a simple notice which may be filed before the security interest attaches or thereafter. The notice itself indicates merely that the secured party who has filed may have a security interest in the collateral described. Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs. . . . Notice filing has proved to be of great use in financing transactions involving

---

[2]This is in conformity with prior California law which required filing to perfect accounts receivable. (Civ. Code, §§ 3019-3020 [repealed by Stats. 1963, ch. 819, p. 1997, § 2, effective Jan. 1, 1965].)

inventory, accounts and chattel paper, since it obviates the necessity of refiling on each of a series of transactions in a continuing arrangement where the collateral changes from day to day." (Com. Code, § 9402, comment 2; see also *American Nat. B. & T. Co.* v. *National Cash Register Co.* (Okla. 1970) 473 P.2d 234, 237-238.)

"Under the Article's notice filing system, the only document that need be placed on record is, in essence, a statement of intention to engage in future security transactions; there is no requirement that new filings be made as new transactions . . . occur." (1 Gilmore, Security Interests in Personal Property, § 11-6, at p. 356.) The financing statement is not required to refer to a specific security agreement. Hence the second agreement was perfected and the financing statement previously filed must be applied to it. The court erred in holding that the second agreement was not perfected.

The financing statement describing the collateral assigned to the Bank as "all accounts, contract rights and chattel paper now owned or hereafter acquired" put a prospective creditor on notice of the probability that there was in existence a security agreement embracing said collateral. The financing statement thus covered all of Kelly's receivables.

The question then arises as to whether the moneys represented by the check of Huber are accounts receivable by Kelly.

2. *The payments by Huber were not Kelly receivables.*

The trial court found that the checks issued by Huber to (1) Grassi, Kelly, Superior and appellant, and (2) to Grassi, Kelly, Richmond and appellant were done so with the intent to pay Superior and Richmond for their work done on the Oak Knoll Hospital, and the funds representing said checks were not an account receivable of Kelly.

An account means "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper." (Com. Code, § 9106.) It is a right earned by performance, whether or not due and payable. (Comment to Com. Code, § 9106.)

The fund represented by the checks constituted a direct payment to respondents and therefore never became an account receivable of Kelly. (1) The general contractor provided for and paid the claims of respondents by virtue of *its* agreement *with its* subcontractor, Grassi. The payment was possible since the subcontract agreement between the general con-

tractor and Grassi provided that the subcontractor would hold the general contractor harmless from any liens or claims, and authorized the payment of any liens or claims from any amounts otherwise due the subcontractor. (2) Kelly was similarly bound to hold Grassi harmless from any liens and claims in its subcontractor agreement.

The record discloses the following: The agreement between Kelly and Grassi provided that: "The Subcontractor [Kelly] further agrees to hold the Contractor [Grassi] harmless against any and all liens and claims of persons for labor or materials or appliances furnished in connection with said work. If at any time there shall be any lien or claim against the Subcontractor for which, if established, the Contractor or the property might be held liable, then the Contractor may retain out of any moneys due or to become due the Subcontractor an amount sufficient to indemnify against liability or loss by reason of such lien or claim, including the cost of litigation, until the same shall be satisfied or discharged, and the Contractor, as a prerequisite to making any payment, may demand satisfactory evidence that the Subcontractor has paid the cost of the work, or proportionate cost of material for which such payment is to be made."

A similar agreement was executed between Grassi and Huber. The payments represented by the Huber checks were payments made by Huber direct to Richmond and Superior pursuant to the agreements that Huber, to indemnify himself from their claims, was entitled to make.

In *McLaughlin* v. *New England Telephone & Tel. Co.* (1963) 345 Mass. 555 [188 N.E.2d 552], one Mogavero entered into five construction contracts over a five-year period with Telephone. During this period, Mogavero borrowed substantial sums from the bank and executed and delivered to the bank instruments on accounts receivable assignment forms of the bank. (*Id.* at p. 554.)

One of the lump-sum contracts between Mogavero and Telephone contained the following provisions: "Article 24 required Mogavero to submit to the architect 'an application for each payment' (including, of course, progress payments). If (art. 25) 'the contractor has made application . . . the architect shall . . . issue . . . a certificate for such amount as he decides to be properly due, or state . . . his reasons for withholding a certificate. . . .' Article 26 provides that the architect 'may withhold . . . any certificate . . . to protect the owner from loss on account of: (a) Defective work . . . (b) Claims filed . . . [or probable]. (c) Failure of the contractor to make payments . . . to subcontractors . . . . (d) A

reasonable doubt that the contract can be completed for the balance then unpaid. . . .' The architect was to inspect the work (arts. 4 and 5 of the contract) and issue a final certificate, after the contractor had shown 'that all payrolls, material bills, and other indebtedness . . . have been paid.' If Mogavero (art. 21, general conditions) should fail to perform any contract provision, Telephone, after notice to Mogavero, could 'make good such deficiencies and . . . deduct the cost . . . from the payment then or thereafter due' subject to the architect's approval." (*Id.* at p. 555, fn. 3.) Telephone paid into court a fund of $63,758.44. This case was a bill in equity, filed by the trustees in bankruptcy of Mogavero. The bank was claiming the aforementioned fund based upon the purported assignments to it by Mogavero. (*Id.* at p. 553.) The *McLaughlin* court was faced with determining which portions of the fund actually constituted accounts receivable of Mogavero.

With respect to the lump-sum contract mentioned above, on September 17, 1957, the day preceding the assignment of accounts receivable to the bank, various items had not yet been completed. The principal deficiency was in relation to the elevator electrical wiring. As of that date, substantial amounts had been paid by Telephone to Mogavero for work performed by subcontractors, but Mogavero had retained a large part of this. Litigation by Westinghouse, the elevator subcontractor, was settled, after the date of the bankruptcy petition and with the bankruptcy trustees' consent, by direct payment by Telephone under article 21, *supra.* (*Id.* at p. 557.)

The court noted the following: (1) that there was no showing that the subcontractors, who as of September 17, 1957 had not been paid, were ever paid by Mogavero the amounts due them; (2) that the bank had not adequately established that, at least up to the date of the bankruptcy petition (a) Telephone could not have invoked the provisions of article 21 of the general conditions (*supra*), or (b) that the architect would not have been free to deny a certificate under article 26 because of Mogavero's failure to pay subcontractors. Based upon the aforementioned observations, the court concluded that: "Claims for payment, in fact subject to such uncertainties, were not sufficiently established in amount and sufficiently clearly owing to be transferred by assignments which we interpret as covering only amounts then due." (*Id.* at p. 557.)

In view of our determination that the funds never became accounts receivable of Kelly, and that appellant's interest never attached thereto,

it becomes unnecessary to discuss respondent's contention concerning an equitable lien.

Judgments affirmed.

Devine, P. J., and Rattigan, J., concurred.

A petition for a rehearing was denied October 27, 1972, and appellant's petition for a hearing by the Supreme Court was denied November 22, 1972.