Robert R. FRANK, Plaintiff-Appellant,

v.

JAMES TALCOTT, INC., A New York Corporation, Defendant-Appellee.

No. 81–5583.

United States Court of Appeals, Eleventh Circuit.

Nov. 29, 1982.

Robert C. Ward, Adams & Ward, John McClure, Miami, Fla., for plaintiff-appellant.

Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., David G. Mulock, Tampa, Fla., for defendant-appellee.

Appeal from the United States District Court for the Southern District of Florida.

Before HILL and HENDERSON, Circuit Judges, and GARZA *, Senior Circuit Judge.

* Honorable Reynaldo G. Garza, U.S. Circuit Judge for the Fifth Circuit, sitting by designa-

ALBERT J. HENDERSON, Circuit Judge:

Robert R. Frank appeals the judgment of the United States District Court for the Southern District of Florida in favor of the defendant, James Talcott, Inc. ("Talcott"), holding that Frank did not establish a valid security interest in certain funds in which both parties asserted an interest. Before us, Frank claims that the district court erred in its application of the Florida Uniform Commercial Code. Because we find that the evidence confirms Talcott's entitlement as a perfected secured creditor to the funds in issue, and that Frank was, at most, an unperfected secured creditor as a matter of law, we affirm the decision of the district court.

Land Services Inc. ("LSI") and its subsidiary, Land Services Sebring, Inc. ("LSSI"), were engaged in the business of subdividing Florida lands into a development known as "Orange Blossom Estates." Beginning in 1969, LSI, acting originally through LSSI, acquired large tracts of land comprised of a certain number of "units." Each unit was further divided into many smaller tracts or lots. Individuals purchased lots from LSI through the device of installment sales contracts which provided for the payment of the purchase price over a period of time not to exceed ten years.

In 1969, Frank sold the property representing units one through eleven of Orange Blossom Estates to LSI, receiving in return a purchase-money mortgage on the land. At the trial Frank contended that simultaneously with the execution of the mortgage, LSI assigned to him a security interest in the installment sales contracts that would come into existence upon the resale of the subdivided lots. Frank was unable to produce a copy of the purported security agreement, claiming that the written agreement had been lost. A UCC–1 financing statement giving notice of Frank's alleged security interest in the installment sales con-

tion.

tracts was filed with the Florida Secretary of State on August 9, 1969. This financing statement failed to mention "proceeds" of the contracts as collateral; the box designating the proceeds as collateral was not checked or "cross-hatched." Proceeds, in this instance, would have been the periodic payments due on the contracts. Frank never filed a continuation statement to this filing as required by Section 679.9–403 of the Florida Uniform Commercial Code. See Fla.Stat.Ann. § 679.9–403 (West 1966).[1]

Expanding upon its land development scheme, LSI purchased the land representing units twelve through nineteen in 1971 from various sellers. In 1973, Talcott, a New York commercial finance company, entered into a "factoring" type arrangement with LSI, agreeing to loan LSI up to 50% of the amounts due LSI under the installment sales contracts from units twelve through nineteen. Talcott also obtained a mortgage on the underlying property and a security interest in the installment sales contracts and their proceeds. Talcott filed a financing statement in accordance with Florida law which described the collateral to include "all present and hereafter acquired land sales contracts . . ." of LSI. The proceeds box on this form was marked, indicating that Talcott also claimed a security interest in the proceeds of the contracts. This financing statement contained no reference to particular units or lots in LSI's development.

On March 13, 1974, Talcott and LSI executed a written amendment to their 1973 loan agreement. By this amendment, Talcott agreed to provide financing to LSI based upon the land and the installment sales contracts in units one through eleven of Orange Blossom Estates. The amendment granted to Talcott a mortgage on the property and extended the security interest provisions of the 1973 loan agreement to installment sales contracts on units one through eleven. The record indicates that at the time of this amendment, Talcott knew of Frank's mortgage on the property representing units one through eleven. The facts are in dispute, however, as to whether Talcott knew of Frank's asserted interest in the corresponding installment sales contracts. Talcott made no additional filings with respect to this amendment to its loan agreement with LSI.

LSI's financial troubles surfaced shortly after it commenced business. Frank filed a foreclosure action against LSI in the early 1970's. LSI was involved in a bankruptcy proceeding in 1974–1975. In 1975, Talcott initiated a foreclosure action against LSI. While Talcott's foreclosure action was pending, payments on the installment sales contracts continued to come in from the lot purchasers. Because it became apparent that several creditors involved in the suit claimed an interest in the payments on the contracts, a fund labeled the "disputed account" was created and the payments were deposited into that account. The creditors battled over the funds and, eventually, most of the money was distributed to Talcott. Frank attempted to intervene in the Talcott foreclosure action at a very late stage in the proceedings. The district court denied intervention, instead ordering that the money remaining in the disputed account, by that time denominated as the "disputed-disputed account," should be paid to Talcott unless another creditor asserted a superior interest in a separate action within ten days of the court's order. Frank attempted to claim such an interest, but the district court, after a bench trial, concluded that he failed to demonstrate any entitlement to the funds held in the "disputed-disputed account."

In its findings of fact and conclusions of law, the district court declined to determine

1. Provisions of the Florida Uniform Commercial Code will be cited hereinafter by section number only. References to the Florida Uniform Commercial Code throughout this opinion are made to Florida's version of the 1962 Uniform Commercial Code. The 1972 amendments were adopted in Florida in 1979, becoming effective in 1980. Therefore, because the facts underlying this dispute arose before the effective date of the amendments, the amended version of the Florida Uniform Commercial Code does not control the resolution of this controversy.

whether LSI had ever granted Frank a security interest in the installment sales contracts. Instead, the court held that even if Frank had such a security interest, it lapsed in 1974 upon his failure to file a continuation statement to his 1969 financing statement. The court also concluded that whatever claim Frank might have had did not cover the payments on the contracts because Frank's purported security interest did not include the proceeds of the installment sales contracts.[2] Finally, the court found Talcott's alleged knowledge of Frank's interest to be irrelevant to a determination of the rights of the parties.

We agree with the district court's conclusion that Frank is not entitled to priority over Talcott's claim and also find it unnecessary to ascertain whether LSI ever granted Frank a security interest in the installment sales contracts. Moreover, we concur in the determination that Talcott's knowledge is not relevant to this dispute. Our decision to affirm, however, rests on somewhat different reasoning than that relied upon by the district court.

▮ Frank correctly argues that the failure to file a continuation statement in 1974 did not extinguish his security interest. The purpose of filing a financing statement is to perfect a security interest, and, thus, attain additional protection against conflicting claims in the same collateral. Having initially filed a financing statement, the creditor must file a continuation statement with the proper state authority within the statutory period in order to preserve its perfected status. Section 679.9–403 of Florida's Uniform Commercial Code provides that:

A filed financing statement ... is effective for a period of five years from the date of filing. The effectiveness of a filed financing statement lapses ... on the expiration of such five year period ... unless a continuation statement is filed prior to lapse.

Therefore, when Frank did not file a continuation statement in 1974, five years from the date of his original filing, the effectiveness of his filed financing statement lapsed. Allowing a financing statement to lapse does not invalidate the security interest, but, rather, under Section 679.9–403 of the Florida Uniform Commercial Code "[u]pon such lapse the security interest becomes *unperfected*." (Emphasis supplied.) Frank's unperfected interest would still be enforceable as between Frank and LSI, but could lose priority as against third party creditors such as Talcott.[3]

▮ Having established that Frank could have been an unperfected secured creditor if he, in fact originally had such an interest, the next step in our analysis is to classify Talcott's interest. The evidence available from the trial record that sheds light on the nature of Talcott's interest in the proceeds of the contracts discloses that (1) Talcott and LSI entered into a loan agreement in 1973 providing Talcott with a security interest in the contracts from units twelve through nineteen and their proceeds; (2) Talcott filed a financing statement in 1973 describing the collateral as *all* of LSI's present and future installment sales contracts, including the proceeds thereof; and, (3) Talcott and LSI amended the 1973 loan agreement in 1974 granting Talcott a security interest in the contracts from units one through eleven and their proceeds. There was also evidence that Talcott loaned money to LSI over the course of the loan agreement.

Section 679.9–204 of Florida's Uniform Commercial Code provides that a creditor's

2. Although it is not explicit in the district court's order, it appears that this second conclusion was based upon Frank's failure to make the proper designation in the proceeds box on his 1969 financing statement.

3. Because we find that whatever interest Frank might have had became unperfected upon his failure to file a continuation statement, we do not consider the ramifications of his failure to indicate a security interest in the proceeds on the financing statement. A determination of whether that omission would relegate Frank to an unperfected position does not affect the outcome of this case since Frank's interest, even if originally perfected, became unperfected when he allowed his financing statement to lapse.

security interest attaches to the collateral when there is an agreement that it attach, value is given by the creditor and the debtor has rights in the collateral. The facts recited above clearly establish Talcott's security interest attached to LSI's contracts and their proceeds. The 1974 amendment to the 1973 loan agreement satisfies the agreement requirement. The debtor, LSI, acquired rights in the collateral, the contracts and their proceeds, when the installment sales contracts were executed with the purchasers. Finally, Talcott gave value to LSI by providing financing over the term of the loan. Thus, Talcott obtained a security interest in the unit one through eleven contracts and their proceeds, the same collateral in which Frank asserts an unperfected interest.

An examination of the provisions of the Florida Uniform Commercial Code also leads to the conclusion that Talcott's 1973 financing statement perfected its interest in this collateral. Section 679.9–302(1) governs the method of perfection of a security interest in installment sales contracts. This section stipulates that a financing statement must be filed in order to perfect such an interest; the version of section 679.9–306(3)(a) applicable to Talcott's interest states that proceeds are similarly perfected by filing as long as "[a] filed financing statement covering the original collateral also covers proceeds." A financing statement is sufficient to perfect a security interest if, among other things, it "contains a statement indicating the types, or describing the items of collateral." Section 679.9–402(1). It is generally accepted that a description of collateral in a financing statement as "all accounts, present and hereafter acquired," is sufficient to perfect an interest in the accounts. It is not necessary to list specific accounts. See, e.g., Richmond Crane Rigging & Drayage Co., Inc. v. Golden Gate National Bank, 27 Cal.App.3d 968, 104 Cal.Rptr. 277 (1972); Heights v. Citizens National Bank, 463 Pa. 48, 342 A.2d 738 (1975); Industrial Packaging Products Co. v. Fort Pitt Packaging International, Inc., 399 Pa. 643, 161 A.2d 19 (1960).

Although some courts have questioned whether a financing statement filed to perfect an earlier security interest can also perfect a later acquired security interest in collateral which comes within the same description, see, e.g. Coin-O-Matic Service Co. v. Rhode Island Hospital Trust Co., 3 U.C.C. Rep.Serv. (Callaghan) 1112 (R.I.Super.Ct. 1966), the Uniform Commercial Code mandates the opposite conclusion. Section 679.-9–402(1) specifies that "[a] financing statement may be filed before a security agreement is made or a security interest otherwise attaches." The Uniform Commercial Code contains no requirement that a financing statement refer to any security agreement that may exist between the parties designated in the financing statement. The central purpose of filing a financing statement is to provide notice that the creditor may have a security interest in the named collateral, the details of which can be ascertained upon further inquiry of the named parties. Owen v. McKesson & Robbins Drug Co., 349 F.Supp. 1327, 1334 (N.D. Fla.1972), aff'd mem., 486 F.2d 1401 (5th Cir. 1973). Moreover, consideration of the commercial realities of modern day financing militates against a requirement that a secured creditor must refile each time it enters into a new loan agreement with a debtor to whom the creditor lends money on a regular basis. Therefore, we agree that a financing statement which adequately describes the collateral can serve to perfect a security interest not contemplated by the parties at the time of the initial filing. See, e.g., In re Gilchrist Co., 403 F.Supp. 197 (E.D.Pa.1975), aff'd mem., 535 F.2d 1246 (3d Cir. 1976); Richmond Crane Rigging & Drayage Co., Inc. v. Golden Gate National Bank, 27 Cal.App.3d 968, 104 Cal.Rptr. 277 (1972); Chrysler Credit Corp. v. Community Banking Co., 35 Conn.Supp. 73, 395 A.2d 727 (Super.Ct.1978); In re Will of Gruder, 89 Misc.2d 477, 392 N.Y.S.2d 203 (Sur.Ct. 1977).

Thus, Talcott's 1973 financing statement covering all installment sales contracts, "present and hereafter acquired" and the proceeds thereof, was sufficient to perfect its interest in the contracts from units one

through eleven and their proceeds. The fact that the statement was originally filed to perfect an interest in the contracts from units twelve through nineteen does not change this conclusion. The filed financing statement certainly gave adequate notice to potential creditors that some, if not all, of LSI's contracts were encumbered by Talcott. When Talcott obtained an interest in the contracts in 1974, the interest was automatically perfected by virtue of the 1973 filing without need for additional filings.

■ The final stage in this analysis is to compare Frank's unperfected security interest to Talcott's later-acquired perfected security interest under the priority rules of Florida's Uniform Commercial Code. At the time that Talcott obtained a perfected security interest, Frank had a UCC–1 financing statement on file with the Florida Secretary of State. If Frank had filed a continuation statement at the proper time, his interest might have been superior to Talcott under the priority rule governing conflicting claims of perfected secured creditors. See § 679.9–312(5)(a). However, as earlier discussed, Frank became unperfected in 1974. A Florida court recognizes that, as a general rule, "[i]t is black letter law that an unperfected security interest is subordinate to a perfected security interest." *Suburbia Federal Savings & Loan Association v. Bel-Air Conditioning Co., Inc.,* 385 So.2d 1151, 1153 (Fla.Dist.Ct.App.1980); see §§ 679.9–301(1), .9–312(5)(a). The only question that remains, then, is whether the fact that Talcott became perfected after Frank would cause Talcott to lose its priority even though Frank's filing lapsed and his interest became unperfected.

Although the Florida courts have not yet addressed this question, the drafters of the Uniform Commercial Code anticipated this problem and explained in Comment 3 to Section 9–403:

[u]nder … subsection (2) [of section 9–403] the security interest becomes unperfected when filing lapses. Thereafter, the interest of the secured party is subject to defeat by those persons who take priority over an unperfected security in-

terest … and under Section 9–312(5) the holder of a perfected conflicting security interest is such a person *even though before lapse the conflicting interest was junior.*

U.C.C. § 9–403 Comment 3 (1962) (emphasis supplied). Hence, although a creditor files a financing statement after another creditor has filed a financing statement covering the same collateral, if the first creditor allows its financing statement to lapse, the claim of the second creditor becomes superior as long as his security interest remains perfected. This interpretation advanced by the code drafters in Comment 3 comports with the decisions reached by other jurisdictions. *See, e.g., Eastern Indiana Production Credit Association v. Farmers State Bank,* 31 Ohio App.2d 252, 287 N.E.2d 824 (1972); *Morse Electro Products Corp. v. Beneficial Industrial Loan Co.,* 90 Wash.2d 195, 579 P.2d 1341 (1978) (en banc). For this reason, it is clear to us that Talcott's perfected security interest takes priority over Frank's unperfected security interest. This conclusion is supported by the Code Comment and the decisions in other jurisdictions and is consistent with the rule in Florida that a creditor's knowledge of conflicting security interests is not relevant to a priority dispute under article nine of the Florida Uniform Commercial Code. *See National Bank of Sarasota v. Dugger,* 335 So.2d 859 (Fla.Dist.Ct.App.1976).

From our examination of the Florida Uniform Commercial Code, it becomes evident that Talcott should prevail in its claim against Frank. Because Frank's security interest became unperfected upon the lapse of his financing statement, no factual determination concerning his interest could give him priority over Talcott's perfected security interest in the same collateral. As between the parties, the record mandates the finding that Talcott is entitled to the payments on the LSI installment sales contracts held in the "disputed-disputed account."

The judgment of the district court is AFFIRMED.