**In the Matter of REDA, INC., Debtor.**

**Bankruptcy No. 84 B 9403.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

Nov. 18, 1985.

Max Chill, Chicago, Ill., for Alba Sciacqua.

Robert Benjamin, Chicago, Ill., for Reda, Inc.

Christopher Bargione, Chicago, Ill., for Water Tower Trust & Savings Bank.

Ron Lev, Chicago, Ill., for Lazarus-Willis & Associates.

## MEMORANDUM OPINION

ROBERT E. GINSBERG, Bankruptcy Judge.

I. *The Facts*

This case can most easily be understood by beginning with a chronological review of the facts.

In August, 1978, the owner of Agostino's Restaurant in Chicago, Illinois, Ms. Alba Sciacqua, entered into an agreement to sell the restaurant to Frank Reda, the debtor's president.[1] On September 15, 1978, Frank

---

1. Although Sciacqua sold the restaurant to Reda, she retained ownership of the building in which the restaurant was housed. As part of the sale transaction, on August 23, 1978, the parties entered into a lease for the restaurant's premises from Sciacqua. The purchase agree- ment and lease required the debtor to insure the building and improvements against fire loss. The lease also provided that if the debtor de- faulted, all fixtures attached to the premises would be considered real property and become property of the lessor. Sciacqua does not allege

Reda executed an installment note in the amount of $220,000.00 payable to Alba Sciacqua. On that same date Frank Reda executed a security agreement (chattel mortgage) granting Alba Sciacqua a security interest in Reda, Inc.'s equipment. On November 29, 1978, Frank Reda signed a Uniform Commercial Code Financing Statement covering: "[r]estaurant, cocktail lounge and catering business; furnishings and equipment of all personal property located at 7 East Delaware Place, Chicago, Illinois." [2] Alba Sciacqua was named as the secured party. On November 29, 1978, Sciacqua attempted to perfect her security interest by filing a financing statement with the Cook County Recorder of Deeds. Of course, the financing statement should have been filed with the Illinois Secretary of State under § 9–401 of the Illinois U.C.C. As pointed out below, this error in filing is not fatal to the Sciacqua secured claim. Sometime thereafter, the debtor obtained insurance covering the restaurant's premises from Union Indemnity Insurance Company of New York ("Union Indemnity" or "the insurance company"). The insurance policy listed Alba Sciacqua among the named insureds.

On May 24, 1982, Frank Reda on behalf of the debtor executed a note in the amount of $150,000.00 payable to Water Tower Trust and Savings Bank ("the Bank" or "Water Tower"). On that same date Frank Reda executed a security agreement granting the Bank a security interest in the inventory, equipment, fixtures and furnishings of Reda, Inc. On May 27, 1982, the Bank filed a financing statement signed by Frank Reda with the Illinois Secretary of State covering all of the debtor's inventory, equipment, fixtures and furnishings, including the furnishings and equipment previously pledged to Sciacqua and covered by Sciacqua's earlier valid financing statement. The Bank has admitted through stipulation and testimony that when it filed its financing statement, it was aware of Alba Sciacqua's prior security interest in the same collateral although Sciacqua's interest had erroneously been filed with the Recorder of Deeds rather than the Secretary of State. (Record 7/9/85 at 32–33, 59–63). On May 19, 1982, the insurance company issued an endorsement to that insurance policy that added Water Tower Trust and Savings Bank as mortgagee as a loss payee.

On April 13, 1983, a fire occurred at Agostino's Restaurant and caused extensive damage. At the time of the fire, the debtor owed Alba Sciacqua $183,676.81 on the September 15, 1978 note and owed the Bank at least $150,000.00 on the May 24, 1982 loan. On April 18, 1983, the debtor hired Lazarus-Willis and Associates, a public fire insurance adjuster, to analyze the extent of the damage and. negotiate a settlement with Union Indemnity. Lazarus-Willis and the debtor entered into a contract to adjust the fire loss. Under that contract, the debtor agreed to assign ten percent of any insurance proceeds to Lazarus-Willis as. compensation for Lazarus-Willis's services. Lazarus-Willis immediately began taking steps to compute the debtor's loss claim from the fire and to pursue that claim with the insurance company.

On November 29, 1983, after the fire had occurred but before either the claim had been paid or the debtor had filed bankruptcy, five years ran on Alba Sciacqua's fi-

---

that the lease was recorded nor is there any evidence in the record that it was recorded. As such, its terms and conditions would be subordinate to any validly perfected interest in the same collateral. U.C.C. §§ 9–301, 9–312(5).

**2.** Although neither the security agreement nor the financing statement specifically mention fixtures, the Court will interpret them solely for purposes of this opinion to include fixtures. We do not actually reach the question of whether the financing statement sufficed to give Sciacqua a security interest in the fixtures. As indi-

cated in the previous footnote, we do not believe the provision in the lease giving Sciacqua a residual interest in fixtures helps Sciacqua's position with respect to fixtures against the Bank.

The security agreement covered "furnishings and equipment of all personal property" at the restaurant's location. Of course, for Article 9 purposes the furnishings of the restaurant were part of its "equipment." Nevertheless, we will use the terms the parties used in their financing statements for the sake of clarity.

nancing statement covering the restaurant's furnishings and equipment without a continuation statement being filed, causing Sciacqua's financing statement to lapse under § 9–403 of the U.C.C. On July 30, 1984, the debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code. On March 19, 1985, the Union Indemnity Insurance Company of New York issued a check in the amount of $74,206.09 as settlement for the damage to the restaurant's contents from the fire. The check was made payable to Reda, Inc., Alba Sciacqua, Water Tower Trust and Savings Bank and All American Bank of Chicago.[3]

On April 11, 1985, the debtor brought a motion for disbursement of the funds. Both Sciacqua and the Bank assert a claim to those funds as a secured creditor. Each claims to be ahead of the other in priority. Lazarus-Willis filed a petition and claim for ten percent of the insurance check representing its fees under its agreement with the debtor, asserting it should be paid ten percent of the proceeds ahead of either Sciacqua or Water Tower. Thereafter, this Court heard testimony and argument over a period of two days. The parties also have filed proposed findings of fact and conclusions of law.[4]

## II. *The Issues*

1. Does Article 9 of the Uniform Commercial Code apply to determine priorities in the insurance proceeds between Sciacqua and the Bank during the period after the fire destroyed the collateral, but before the insurance company issued the check, i.e. while the unpaid claim was being developed and pending?

2. Between the Bank and Sciacqua, without regard to knowledge, who prevails under the U.C.C. in light of the fact that Sciacqua's security interest was perfected at the time of the fire but had lapsed by the time that Union Indemnity issued the insurance check?

3. Assuming the Bank wins on the second issue, does the Bank's earlier knowledge of Sciacqua's prior perfected security interest prevent that junior secured party from becoming superior under Illinois law where the prior interest has subsequently lapsed?

4. Is Lazarus-Willis entitled to have its fees paid from the insurance proceeds ahead of the claims of either or both parties claiming to be secured by those same proceeds where those parties had perfected security interests in the proceeds at the time the agreement between Lazarus-Willis and the debtor was entered into?

## III. *Analysis*

### A. *The Dispute Between the Secured Creditors—Sciacqua versus the Bank*

#### 1. *Governing Law*

Before the Court can analyze the priority of the parties' security interests, it must determine whether to apply the Uniform Commercial Code or state insurance law to the events that occurred after the fire destroyed the collateral, but before Union Indemnity issued the check. In general, Article 9 of the U.C.C. does not apply to security interests in insurance or in claims under insurance policies. U.C.C. § 9–104(g).[5] Thus, in cases involving security

---

**3.** On June 14, 1982, All American Bank of Chicago filed a termination statement of its security interest in the equipment and inventory of Reda, Inc. Thus, it is not a party in interest to this dispute.

**4.** The debtor, Reda, Inc., and Water Tower Trust and Savings Bank filed joint proposed findings of fact and conclusions of law. The debtor believes all of the insurance proceeds should go to Water Tower.

**5.** Ill.Ann.Stat. ch. 26, § 9–104(g) (Smith-Hurd 1985). Illinois has adopted the 1972 version of Article 9 of the Uniform Commercial Code without substantial change in Ill.Ann.Stat., ch. 26, § 9–101 *et seq.* (Smith-Hurd 1985). Thus, the Court will use only the U.C.C. reference for the sake of brevity unless the Illinois version departs significantly from the official version of the U.C.C.

interests in insurance policies, the Court must refer to state law other than the U.C.C. Nevertheless, we conclude that Article 9 of the U.C.C. should apply to resolve the dispute between Sciacqua and the Bank. All events that have transpired in this case from the time the parties filed their financing statements to the time the insurance check was issued must be analyzed under Article 9. We reach this conclusion because we believe that this is not a case involving a security interest in insurance as such. Instead the parties' rights to the insurance proceeds derive from their original security interests, security interests which clearly were covered by Article 9.

■ An analysis of the 1972 version of U.C.C. §§ 9–306 and 9–104(g), both of which are in effect in Illinois, compels this approach.[6] Section 9–306 governs a secured party's rights to the proceeds of collateral covered by a security interest. This statutory section is directly relevant because the instant case involves competing claims to the insurance proceeds payable as a result of damage to the debtor's equipment, fixtures and furnishings, i.e. to collateral covered by Article 9.

Section 9–306(1) provides in part:

'Proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement.

Although at least one court has interpreted § 9–306 to mean that proceeds do not come into existence until they are received, *Terra Western Corp. v. Berry & Co.*, 207 Neb. 28, 33–34, 295 N.W.2d 693, 697 (1980), the better view is that the *right to payment* under the insurance policy is also proceeds for these purposes and is subject to Article 9 of the U.C.C. *Brown v. First Nat. Bank of Dewey*, 617 F.2d 581, 583–84 (10th Cir. 1980); *Paskow v. Calvert Fire Insurance Co.*, 579 F.2d 949, 954 (5th Cir.1978); *PPG Industries v. Hartford Fire Insurance Co.*, 531 F.2d 58, 62 (2d Cir.1976); *Kahn v. Capital Bank*, 384 So.2d 976, 977 (D.Fla. 1980); *In re Linders Card Shop, Inc.*, 27 U.C.C.Rep.Serv. 575, 580 (S.D.N.Y.1979); *Aetna Insurance Co. v. Texas Thermal Industries*, 436 F.Supp. 371, 376–77 (E.D. Tex.1977), *aff'd*, 591 F.2d 1035 (5th Cir. 1979); *See also* B. Clark, The Law of Secured Transactions Under The Uniform Commercial Code, ¶ 1.8(7) (1980).

■ Accordingly, Article 9. of the U.C.C. should apply where the security interest is not in the policy itself but is in proceeds of insurance payable on account of the destruction of underlying collateral, such as the equipment and fixtures in this case, which are covered by Article 9. The 1972 amendments to § 9–104(g) further compel this result. The 1972 amendments added an exception to the exception where the insurance proceeds are also Article 9 proceeds under § 9–306. As indicated in the previous paragraph, there is no doubt under § 9–306 that the proceeds resulting from the fire loss to this collateral are Article 9 "proceeds."[7] Thus, we cannot avoid concluding that Article 9 governs at all stages of the transactions in question in determining priorities between Sciacqua and the Bank. It obviously governed at the time of Sciacqua's and the Bank's original secured transactions. It also governs priorities in the right to payments accruing

---

6. Although the insurance company is in New York, all of the events giving rise to this dispute occurred in Illinois and all of the parties are Illinois residents. It is clear that the relevant law to be applied here is Illinois law.

7. The current version of § 9–104(g) provides: "[t]his Article does not apply ... (g) to a transfer of an interest in or claim in or under any policy of insurance, except as provided with respect to proceeds (Section 9–306) and priori-

ties in proceeds (Section 9–312); ..." This codifies the judicial approach before the 1972 amendments to the effect that § 9–104(g) excluded only "original" security interests in insurance policies, and that where the claim to an interest in insurance proceeds is "derivative" from the destruction of collateral, what is produced is proceeds under § 9–306 of the U.C.C. *See generally* B. Clark, The Law of Secured Transactions ¶ 1.8(7) (1980).

at the time of the fire. Finally, it governs priorities between the secured parties in the cash proceeds paid by the insurance company which, of course, is the heart of the dispute this Court must resolve.

To hold otherwise, i.e., to hold that the situation at the precise time that Sciacqua's filing lapsed, after the fire but before the check was issued, is not covered by Article 9 due to § 9–104(g) leads to the absurd result of the first and third stages of this series of events being covered by Article 9, while the second stage is outside of Article 9 and is governed by non-Code state law. The more logical result of having the entire case determined by Article 9 rules can be reached simply by interpreting § 9–306(1) to mean what it says, that the right to the payment of insurance proceeds on account of damage to Article 9 collateral is "proceeds" for Article 9 purposes.[8] Such a reading does not strain the language of either § 9–104(g) or § 9–306(1) or the Official Comments thereto. Indeed, such a reading comports with the spirit of Article 9 to organize and simplify the law governing secured transactions in personal property by having a single body of law—Article 9—resolve this priority dispute between secured parties. *Cf.* U.C.C. §§ 1–102(1)–(2), § 9–102. This would appear to be one of the purposes underlying the 1972 amendments to §§ 9–104(g) and 9–306(1).[9]

Viewing the events in question from an Article 9 perspective, the series of events should be viewed as a continuum. At first both Sciacqua and the Bank had security interests in the debtor's equipment, furnishings, and fixtures (at least as assumed in this opinion). Once the fire destroyed or damaged the restaurant's equipment, furnishings, and fixtures, Sciacqua's and the Bank's security interests shifted from the collateral to the right to the proceeds under the insurance policy. When Union Indem-

nity issued the insurance check, Sciacqua's and the Bank's security interests then shifted to the actual proceeds of the insurance policy. *See PPG Industries, Inc. v. Hartford Fire Insurance Co.,* 531 F.2d 58, 62 (2d Cir.1976); *Aetna Insurance Co. v. Texas Thermal Industries,* 436 F.Supp. 371, 376–77 (E.D.Tex.1977), *aff'd,* 591 F.2d 1035 (5th Cir.1979). By the time of the final shift the Sciacqua security interest had become unperfected. The next question becomes what the effect of that lapse in perfection is in terms of priority.

### 2. *Priority of Secured Claims*

Section 9–403 of the Uniform Commercial Code provides that a filed financing statement is effective for a period of five years from the date of filing. It also provides that a filed financing statement lapses if a continuation statement has not been filed within six months prior to the expiration of the five year period. In this case, Sciacqua failed to file a continuation statement at any time prior to the termination of the five year statutory time limit which expired on November 29, 1983, and, on that date, Sciacqua's financing statement lapsed under the U.C.C. These facts are not in dispute.

The controversy in this case centers around the consequences of the lapse of Sciacqua's financing statement. The Bank urges the Court to apply the literal language of § 9–403(2). That language states that "[u]pon lapse the security interest becomes unperfected ... (and) it is deemed to have been unperfected as against a person who became a purchaser or lien creditor before lapse."[10] Sciacqua does not seriously contest that this provision by its literal terms applies in these circumstances.

---

**8.** The right to payment is "proceeds" under U.C.C. § 9–306(1) because it is "[i]nsurance *payable* by reason of loss or damage to the collateral ..." (emphasis added).

**9.** See the explanation "Reasons for 1972 Change" to § 9–306 in the Official Text of the 1972 changes in the U.C.C.

**10.** Of course, the Bank, as a competing lender, is a "purchaser" for these purposes. U.C.C. §§ 1–201(32), (33). *See also* B. Clark, *supra* n. 7 at ¶ 2.14.

■ We agree that this language in § 9–403 bears directly on the issue of priority raised by the facts of this case. It is true that Sciacqua, by filing her financing statement first, had priority over the Bank in the collateral when the fire occurred at the restaurant on April 13, 1983. U.C.C. § 9–312(5)(a). However, while both parties were awaiting payment of the insurance proceeds, Sciacqua allowed her security interest to lapse. Section 9–403 unequivocally provides that once Sciacqua's filed financing statement lapsed the Bank's junior interest in the proceeds automatically assumed a superior status to Sciacqua's now unperfected security interest so long as the Bank's interest remained perfected.[11] *See also* U.C.C. §§ 9–306(3), 312(5)(a). *Frank v. James Talcott, Inc.,* 692 F.2d 734, 739 (11th Cir.1982); *Security Nat. Bank v. Dentsply Professional Plan,* 617 P.2d 1340, 1343 (Okla.1980); *Morse Electro Products Corp. v. Beneficial Industrial Loan Co.,* 90 Wash.2d 195, 579 P.2d 1341, 1343 (1978) (en banc) (dicta).[12]

### 3. *Knowledge of Prior Interest*

Sciacqua urges the Court to take an alternate route in deciding the parties' priority. Sciacqua concedes that she recorded the November 29, 1978 financing statement with the Cook County Recorder of Deeds rather than with the Illinois Secretary of State as required by § 9–401(1)(c) of the Illinois statutes.[13] Sciacqua argues that a filing made in good faith in an improper place is effective against subsequent parties who became secured by the same collateral, and who had knowledge of the contents of the improperly filed prior security interest. U.C.C. § 9–401(2). Thus, Sciacqua concludes that the Bank's knowledge of her security interest permanently prevents the promotion of the Bank's junior security interest even after the expiration of the five year period.

■ Sciacqua's argument, however, misses the point. Although her security interest may have been perfected at one time by virtue of § 9–401(2) of the Illinois statutes and have been effective against the Bank by virtue of the Bank's knowledge, it lapsed and became junior to the Bank's perfected security interest on November 29, 1983. The lapse provision is § 9–403, not § 9–401. While knowledge may be relevant under § 9–401(2), the Bank's knowledge of Sciacqua's security interest is irrelevant for purposes of § 9–

**11.** The Bank's security interest continues to remain perfected under § 9–403(2) while these proceedings are pending. Section 9–403(2) states in part:

> If a security interest perfected by filing exists at the time insolvency proceedings are commenced by or against the debtor, the security interest remains perfected until termination of the insolvency proceedings and thereafter for a period of 60 days or until expiration of the 5 year period, whichever occurs later.

See also *Matter of Chaseley's Foods, Inc.,* 726 F.2d 303, 311 (7th Cir.1983) (interpreting Indiana law). The Bank's financing statement, filed on May 27, 1982, remains perfected because neither the five year period has run nor have the insolvency proceedings terminated. Sciacqua cannot take advantage of this provision as her financing statement lapsed *before* the filing of the petition in this case.

**12.** *See also* Skilton, "The Secured Party's Rights in a Debtor's Insurance Under Article 9 of the Uniform Commercial Code (and Related Matters)", 1978 S.Ill.U.L.J. 500, 521–22, where the author states:

> Elevating the secured party's position to the status of the holder of an Article 9 proceeds

security interest in the insurance entitlement gives the secured party a firm position to withstand various adverse claims of third parties—provided, of course, this proceeds security interest is perfected, which will normally be the case if the original security interest in the collateral is perfected by filing. Its existence is but a 'continuation' of the security interest in the original collateral, in the semantics of Article 9. *And if perfection is also continuous,* there will never be a time when a creditor of the debtor, becoming a 'lien creditor' by legal process, can acquire superior rights in the insurance proceeds.

(emphasis supplied). The opposite result obtains here from Sciacqua's point of view. Perfection of Sciacqua's security interest was *not* continuous. Instead, her perfection lapsed. Her failure properly to maintain the perfection of her security interest in proceeds allowed the Bank to gain superior rights.

**13.** Illinois has adopted the Second Alternative Subsection (1) to § 9–401. Ill.Ann.Stat., ch. 26, § 9–401 (Smith-Hurd 1985).

403. That section nowhere states that a junior secured party's knowledge of a prior security interest prevents that junior secured party from prevailing over the prior secured party once the prior party's filed financing statement lapses. Courts also have wisely declined to read such language into the U.C.C. *See Frank v. James Talcott, Inc.*, 692 F.2d at 739; *Growth Properties v. Lempert*, 144 Cal.App.3d 983, 989, 193 Cal.Rptr. 102, 105 (Dist.Ct.App.1983).

In addition Sciacqua cannot avoid the five year limitation on filed financing statements imposed by § 9–403 by erroneously filing with the Recorder of Deeds rather than the Secretary of State. Sciacqua cannot seriously argue that a financing statement filed erroneously with the Recorder of Deeds has no expiration date, while one correctly filed with the Secretary of State lasts only five years. If that were the case, all creditors with Article 9 security interests should "erroneously" file their financing statements with the Recorder of Deeds in addition to filing with the Secretary of State to maximize the protection against lapse at least as to those creditors with knowledge. Such a result is absurd.

The policies behind Article 9 of the Uniform Commercial Code mandate the result we reach in this case. Article 9 was adopted in part to provide notice to parties about the debtor's property and offer certainty and protection to a party with a secured interest in that property. *In re Southern Properties, Inc.*, 44 Bankr. 838, 844 (Bankr.E.D.Va.1984). *See also* B. Clark, *supra* n. 7 at ¶ 3.1. The filing of a continuation statement helps further these goals. The continuation statement lets other parties know that the secured party's security interest is to extend beyond the five year period. This is true even though a fire destroyed or damaged the collateral. For example, after the fire third parties might have negotiated with the debtor as part of a reconstruction loan to acquire a security interest in both undamaged furnishings and equipment and in the proceeds of the insurance policy covering damaged furnishings and equipment. Such a lender should have been able to determine whether Sciacqua had a security interest in the inventory and equipment before the fire and in the proceeds after the fire. Because Sciacqua's financing statement had lapsed, the lender should be able to assume that it could lend against all of the collateral safely.[14] It is therefore necessary for a secured party to maintain its priority position by filing a continuation statement to give notice to such third parties.

Nothing in the Uniform Commercial Code relieves the secured party of the duty to maintain a current financing statement on file if the collateral is destroyed or damaged. U.C.C. § 9–403. In fact, the U.C.C. provides only three exceptions to the rule that secured parties must file continuation statements to remain perfected. None of the exceptions apply in this case.[15]

---

**14.** Actually, on the facts of this case, such a lender would not be bound by Sciacqua's security interest even if it had not lapsed. Inquiry would properly be made to the Secretary of State's office to determine the existence of prior security interests in the collateral. Such inquiry would not reveal the Sciacqua security interest, which was erroneously filed with the Recorder of Deeds. Thus being without knowledge of the Sciacqua interest, the hypothetical lender would not be bound by it. U.C.C. § 9–401(2).

The fact that Sciacqua was named as a loss payee on the insurance policy should not rescue her from her failure to keep her security interest perfected. All American Bank of Chicago was a named loss payee as well, although its security interest had terminated. *See supra* n. 3. If a lender asked the debtor about All American Bank of Chicago and Sci-

acqua, a less than honest debtor might well have claimed both had been paid and that is why Sciacqua let her financing statement lapse. The status of the U.C.C. filings of both might well have lulled such a lender into thinking it could advance money to the debtor against the insurance claim without having to worry about either All American Bank of Chicago or Sciacqua. To then hold that Sciacqua is entitled to priority would make that lender the victim of a secret security interest outside of the record of valid Article 9 filings, exactly the result Article 9 was meant to avoid if possible.

**15.** The three exceptions arise in the case of lapse during insolvency proceedings, in situations where the debtor is a transmitting utility, and in situations where a real estate mortgage constitutes a fixture filing. U.C.C. §§ 9–403(2),

The drafters of the Uniform Commercial Code and the Illinois legislature recognized the necessity of certain exceptions but did not include the destruction of the collateral among them. This Court will not create a fourth exception judicially.[16] Thus, this Court concludes that Water Tower's perfected security interest in the proceeds takes priority over Sciacqua's earlier but unperfected security interest in those same proceeds.[17]

## B. The Priority of the Fire Insurance Adjuster

The debtor hired Lazarus-Willis in its capacity as a public fire insurance adjuster soon after the fire at the restaurant and well before the debtor filed its bankruptcy petition. The debtor agreed to pay Lazarus-Willis ten percent of the insurance proceeds it helped obtain by purporting to assign ten percent of the future proceeds to Lazarus-Willis.[18] The evidence indicates that the debtor entered into the contract with Lazarus-Willis, including the ten per-cent contingent fee arrangement, willingly and not under any kind of duress or lack of understanding as to all of its terms. There is no doubt that Lazarus-Willis would be entitled to its fees ahead of any claims the debtor might be able to assert to the insurance proceeds.[19] However, the question remains whether the ten percent contingent fee arrangement is enforceable against the secured creditor, Water Tower, so as to enable Lazarus-Willis to be paid out of the proceeds which its efforts produced. Otherwise, there will be no proceeds left for Lazarus-Willis after Water Tower has been paid for its claim.

At the time the debtor filed its petition, its contract with Lazarus-Willis was still executory in nature. An executory contract generally is defined as a contract under which the obligations of both parties are so far unperformed that failure of either to complete performance would constitute a material breach excusing the other from performance.[20] Charles J. Willis of

---

(6). There is no allegation that Sciacqua filed a real estate mortgage covering fixtures in this case with any office. *See also supra* note 10.

**16.** Sciacqua also seeks to recover the insurance proceeds by a blanket assertion that she is entitled to an equitable lien in the proceeds. We cannot agree. An equitable lien is not appropriate in bankruptcy where the party has not expended all efforts to perfect the interest upon which it seeks such a lien. *In re Merts Equipment Co.*, 438 F.Supp. 295, 299 (M.D.Ga.1977); *Matter of Rettig*, 32 Bankr. 523, 524–25 (Bankr. D.Del.1983); *In re O.P.M. Leasing Services, Inc.* 23 Bankr. 104, 119 (Bankr.S.D.N.Y.1982); *In re Washington Communications Group, Inc.*, 10 Bankr. 676, 680 (Bankr.D.C.1981). Sciacqua did not file a continuation statement and allowed her lien to lapse. There is no allegation that anybody or anything prevented her from filing such a statement. An equitable lien therefore cannot lie. In any case, the validity of an equitable lien under the Bankruptcy Code is doubtful at best. *See, e.g.,* 11 U.S.C. § 544(a); *See also* Collier on Bankruptcy, § 60.50 (14th ed. 1977).

**17.** Because the Water Tower claim alone is sufficient to exhaust all of the proceeds, it is unnecessary to consider whether Sciacqua's claim would be good against any other party, including the estate.

**18.** The debtor and Lazarus-Willis entered into a similar contractual payment scheme for Laza-rus-Willis's work regarding damage to the building itself. The Court expresses no view as to the validity of Lazarus-Willis's claim for additional fees under that contract. Only the Lazarus-Willis claim to ten percent of the insurance proceeds from loss and damage to the contents of the building is before the Court in this matter. The question of Lazarus-Willis's rights to be paid on the building claim as opposed to the contents claim is before the Court in another, separate proceeding in this case.

**19.** *See In re J. Bernheim Co.*, 35 Bankr. 350, 351 (Bankr.E.D.Pa.1983); *See also* Collier on Bankruptcy, § 541.12 (15th ed. 1985):

"Fire insurance policies are frequent subjects of assignment, usually as security. Where a fire insurance policy has been so assigned by the debtor, prior to bankruptcy, the assignee will be entitled to the proceeds thereof to the extent of his claim, unless it can be shown by the trustee that the assignment was invalid or voidable."

**20.** Countryman, "Executory Contracts in Bankruptcy: Part I", 57 Minn.L.Rev. 439, 460 (1973). The Bankruptcy Code does not define "executory contract." While the Countryman definition is not perfect and does not work in all cases, it is valuable as a general rule. There is no reason why the Countryman definition should not be applied in this case.

the firm testified that Lazarus-Willis did not complete its work on the claim until December 1984, which was after the petition was filed on July 30, 1984. As of the time of the petition the claim had yet to be resolved and Lazarus-Willis had yet to be paid any fees it might have earned. Hence, the contract in question was executory on the date the debtor filed its petition and is governed by § 365. Under § 365(d)(2) a Chapter 11 debtor such as Reda, Inc. may assume or reject an executory contract such as the Lazarus-Willis agreement at any time until the plan is confirmed unless the court on the request of the other party to the contract fixes an earlier date for the debtor to assume or reject. The debtor's decision to assume or reject an executory contract is subject to court approval. Reda, Inc. has neither had a plan confirmed nor has it filed any motion to assume or reject the Lazarus-Willis agreement. Lazarus-Willis has not asked the Court to fix a time for the debtor to assume or reject this agreement. Nevertheless, this case presents the rare instance where the debtor's actions with regard to an executory contract constitute an assumption of that agreement for § 365 purposes. *See, e.g., In re Concrete Pipe Machinery Co.,* 28 Bankr. 837, 841 (Bankr.N.D.Iowa 1983); *In re California Steel Co.,* 24 Bankr. 185, 188 (Bankr.N.D.Ill.1982); *In re Yonkers Hamilton Sanitarium, Inc.,* 22 Bankr. 427, 435 (Bankr.S.D.N.Y.1982) *aff'd,* 34 Bankr. 385 (S.D.N.Y.1983); *In re Shoppers Paradise, Inc.,* 8 Bankr. 271, 278–79 (Bankr.S.D.N.Y.1980). Lazarus-Willis continued to perform services for the debtor after the filing of the petition. The debtor knew what was happening. The debtor has willingly accepted the benefits of the contract and therefore must also assume the burdens. There is no evidence the debtor requested Lazarus-Willis to cease representing it in the handling of the fire loss. In addition, Mr. Willis testified that he was unaware of the debtor's bank-

ruptcy petition until after the firm finished working on the fire loss.[21]

On these facts, the Court could either hold that the debtor assumed this contract by its actions and give its approval of that assumption *nunc pro tunc* or hold that the debtor is estopped to deny that it has assumed the contract. The Court adopts the former theory. The debtor's acceptance of the check coupled with the balance of the debtor's actions with respect to the Lazarus-Willis agreement constitute an acceptance of that agreement. The Court hereby approves that assumption.

■ The assumption of the Lazarus-Willis agreement works to give Lazarus-Willis an unsecured first priority administration claim for its fees. *Cf.* 11 U.S.C. § 365(g)(2); *In re Concrete Pipe Machinery Co.,* 28 Bankr. 837, 841 (Bankr.N.D. Iowa 1983). Ordinarily all unsecured claims, even administration claims, come behind all secured claims. However, § 506(c) of the Bankruptcy Code provides that the trustee is entitled to be reimbursed ahead of a secured creditor from proceeds of collateral that the trustee preserves or sells for the benefit of a secured creditor. In order to justify such an allowance of compensation or expenses, the burden lies with the party asserting the § 506(c) right to prove a quantifiable benefit to the secured creditor. *Brookfield Production Credit Assn. v. Borron,* 738 F.2d 951, 953 (8th Cir.1984); *Matter of Trim-X, Inc.,* 695 F.2d 296, 299 (7th Cir.1983); *Dozoryst v. First Financial Savings and Loan Assn. of Downers Grove,* 21 Bankr. 392, 394 (Bankr.N.D.Ill.1982). Although § 506(c) refers to the trustee's right to assert such a claim, the caselaw makes it clear that in the appropriate facts and circumstances, a party other than the trustee ought to be able to assert the claim as well. Thus, a debtor-in-possession may also assert this superpriority claim if it proves such a quantifiable benefit. *In re Meat Service Spe-*

---

**21.** Lazarus-Willis is not listed as a creditor in the debtor's schedules, nor is this agreement listed in any list of executory contracts filed with this Court. Such a list, although required by Bankruptcy Rule 1007(b), was apparently never filed in this case.

*cialties, Inc.,*[22] Bankr. 350, 352 (Bankr.W. D.Okla.1982); *In re Hamilton,* 18 Bankr. 868, 873 (Bankr.D.Colo.1982). By the same token an unsecured administration claim creditor who provides quantifiable benefit to a secured creditor and the estate is entitled to a superpriority claim as compensation for its efforts in this regard. It is clear that Lazarus-Willis qualifies for the § 506(c) claim. Because its contract with

the debtor was assumed, its claims to compensation under the contract are entitled to administration claim priority.[22] *See N.L. R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984).[23] Lazarus-Willis's actions provided the Bank with quantifiable benefit. But for the efforts of Lazarus-Willis there would be no fund to be battling over.[24]

**22.** The Court's analysis is based on the premise that the debtor and Lazarus-Willis had a contractual agreement that the firm would receive ten percent of the proceeds for its services. We need not decide whether our conclusion that the firm is entitled to that percentage would change if we accept the firm's contention that the debtor actually *assigned* ten percent of the proceeds to Lazarus-Willis as payment. If an assignment had occurred, Lazarus-Willis would be asserting its rights to the insurance policy itself, not to the proceeds of Article 9 collateral. Therefore, Illinois law other than the U.C.C. would determine the firm's rights to payment and the priority of its claim. U.C.C. § 9–104(g); *Immel v. Travelers Insurance Co.,* 373 Ill. 256, 262, 26 N.E.2d 114, 117 (1940). Because this opinion adopts the view that the agreement between the debtor and Lazarus-Willis is an executory contract for Bankruptcy Code purposes, our analysis is confined to that theory. The assignment theory raises some more difficult problems because of our view that Water Tower had a prior perfected security interest in all of the proceeds due under the policy at the time Lazarus-Willis was retained and was given the assignment of ten percent of the proceeds. Water Tower's security interest in those proceeds has never lapsed. In addition, no one has suggested that an insurance adjuster is entitled to a statutory lien in the proceeds its efforts produce. Were such a lien to exist, the result would be easier to determine. *See* U.C.C. § 9–310.

**23.** *See also* 124 Cong.Rec. H11089 (Sept. 28, 1978), *reprinted in* 1978 U.S.Code Cong. & Ad. News 6436, 6451 (statement of Rep. Edwards); 124 Cong.Rec. S17406 *reprinted in* 1978 U.S. Code Cong. & Ad.News 6505, 6520 (statement by Sen. DeConcini), where it is stated:

Any time the trustee or debtor in possession expends money to provide for the reasonable and necessary cost and expenses of preserving ... a secured creditor's collateral, the trustee or debtor in possession is entitled to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party.

A strong argument can be made that Lazarus-Willis claims § 506(c) priority derivatively through the debtor-in-possession. The obligation was incurred by the debtor-in-possession as part of its expenses in administering this

Chapter 11 estate. By assuming the contract, the debtor obligated itself to pay the ten percent fee to Lazarus-Willis. If it had paid the fee to Lazarus-Willis voluntarily or had been ordered to do so by this Court the debtor-in-possession clearly could have in turn asserted a § 506(c) reimbursement claim against the Bank. It would seem somewhat ridiculous to suggest that Lazarus-Willis could only assert the § 506(c) claim indirectly by following the process outlined in the previous sentence. Common sense says the firm ought to be able to assert the claim directly to allow the Court to focus on the real dispute here, which is between Lazarus-Willis and the Bank, not between the debtor and the Bank.

The Court gives no weight to the fact that the debtor is now hostile to Lazarus-Willis's claim. The debtor would like to limit or deny Lazarus-Willis's fees to get as much money as possible to the Bank. The reason for this is quite simple. The debtor's principals guaranteed the Bank's loan to the debtor. The debtor's chances for reorganization appear slim; therefore, the debtor's principals would like to maximize the the Bank's recovery to minimize their own exposure.

**24.** It is worth noting that even if no bankruptcy petition had been filed, Lazarus-Willis still would have been entitled to its fees ahead of the Bank under the substantial benefit doctrine. Under that doctrine, a party that renders a substantial service to another party is entitled to reasonable fees as reimbursement. *Mills v. Electric Auto-Lite,* 396 U.S. 375, 393–94, 90 S.Ct. 616, 626, 24 L.Ed.2d 593 (1970); *Hamer v. Kirk,* 64 Ill.2d 434, 437, 442, 1 Ill.Dec. 336, 337–38, 340, 356 N.E.2d 524, 525–26, 528 (1976). The doctrine most frequently rewards the efforts of attorneys; however, the same equitable grounds that protect attorneys who confer such benefits ought to protect an insurance adjuster who does likewise. The insurance adjuster, like the attorney, expends time and resources to confer a substantial benefit on a third party from whom it seeks only to recover reasonable fees. Union Indemnity would not have issued the check for the fire loss if the debtor's claim under the insurance policy had not been properly prepared and submitted in a timely fashion. The Bank would have been forced to hire its own

Therefore, Lazarus-Willis is entitled to ten percent of the insurance proceeds.[25]

## IV. *Conclusion*

The Court concludes that Water Tower Trust and Savings Bank's security interest in the insurance proceeds is superior to that of Alba Sciacqua, and, therefore, that the Bank is entitled to the entire $74,206.09 of the insurance proceeds less the adjuster's fees allowed by the Court in this opinion. The debtor is ordered to disburse the funds in accordance with the opinion.[26]

adjuster if none had been employed. Lazarus-Willis deserves compensation for its work. In the instant case, the efforts of Lazarus-Willis created the insurance proceeds and the Bank, as the secured party entitled to those funds, reaped a quantifiable benefit.

25. The conclusion that Lazarus-Willis is entitled to ten percent of the proceeds is based on the fact that the debtor assumed its agreement with Lazarus-Willis by accepting the check. When a debtor assumes an executory contract, it does so *cum onere*, i.e. it assumes the contract with all of its burdens. A debtor cannot assume in part and reject in part. It either assumes the whole contract or none of it. It cannot, as much as it might like to do so, assume the good parts of the contract and reject the bad. *N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984); *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir.1985); *Lee v. Schweiker,* 739 F.2d 870, 876 (3rd Cir.1984); *In re Godwin Bevers Co., Inc.,* 575 F.2d 805 (10th Cir.1978); *In re Godwin Bevers Co., Inc.,* 24 B.R. 185, 188 (Bankr.N.D.Ill. 1982). Thus the debtor could not accept the check without also obligating itself to pay ten percent of that check to Lazarus-Willis.

An insurance adjuster such as Lazarus-Willis is not a "professional person" for Bankruptcy Code purposes. *See In re Seatrain Lines, Inc.,* 13 Bankr. 980, 981 (Bankr.S.D.N.Y.1981). No order was obtained by the debtor approving retention of Lazarus-Willis to adjust the claim, nor was any such order necessary. *Cf.* 11 U.S.C. § 327(a). Thus, this is not a case where the Court can reexamine the fee arrangement with Lazarus-Willis to see by hindsight if it is improvident. *Contrast* 11 U.S.C. § 328(a). The debtor made its bargain with Lazarus-Willis, and it is now stuck with it. However, even if the Court could reexamine the Lazarus-Willis fee agreement given the evidence produced about time spent, normal hourly rates, industry custom, and results obtained, the Court would not alter the arrangement.

26. The Court has been made aware by the parties that this litigation might have been an exercise in futility in light of Union Indemnity's involvement in insolvency proceedings of its own in New York state. Much potentially wasted time and effort of this Court and the parties could have been avoided if the insurance check had been cashed at a time when Union Indemnity was still honoring its checks and the proceeds placed in an escrow account pending the outcome of this dispute. We draw no conclusions about who, if anyone, might be liable for the damage the estate might suffer in the event the Bank is unable to recover the $74,206.09 in full in the New York receivership.