In re OPELIKA MANUFACTURING CORPORATION and Sew Simple Systems, Inc., Debtors.

Bankruptcy Nos. 85 B 6582, 85 B 6583.

United States Bankruptcy Court, N.D. Illinois, E.D.

Oct. 16, 1986.

Benjamin Schwartz, Altheimer & Gray, Chicago, Ill., for debtor.

Joseph Gavin, First Nat. Bank of Chicago, Chicago, Ill., for First Nat. Bank.

Richard Mason, Levit & Mason, Ltd., Chicago, Ill., for Unsecured Creditors Committee.

## MEMORANDUM OPINION

ROBERT L. EISEN, Chief Judge.

This matter is before the Court on the motion of the First National Bank of Chicago ("FNB") for relief from the automatic stay to hold a public sale of stock pledged to FNB by Opelika Manufacturing Corporation ("Opelika"). Opelika opposes the motion and the Official Creditors' Committee of Opelika (the "Committee") supports the motion in part and opposes it in part. The Court held hearings on the motion on July 8, 1986, July 11, 1986 and July 21, 1986 and has reviewed the evidence and testimony adduced at the hearings, and the post-hearing memoranda submitted by the parties. For the reasons set forth below, the Court grants in part and denies in part the relief requested by FNB.

## I. BACKGROUND

On May 23, 1985, Opelika filed a voluntary petition under Chapter 11 of the Bank-

ruptcy Code (11 U.S.C. § 101 *et seq.*).[1] On the same day, Sew Simple Systems, Inc. ("Sew Simple"), a 100% owned subsidiary of Opelika, also filed a voluntary petition under Chapter 11. Pursuant to §§ 363, 1107 and 1108, both debtors retain possession of their assets and continue to operate their businesses as debtors-in-possession.

On November 28, 1984, Opelika executed two promissory notes payable to FNB in an aggregate amount of $2,975,000.00. As of May 23, 1985, the date the Chapter 11 petitions were filed, Opelika owed FNB $2,394,776.41 in principal and interest on the notes and both notes were in default. The current balance due on the notes is between $2.4 and $2.5 million.[2]

FNB has the following assignments and agreements as security and support for its loans to Opelika.[3]

1. Opelika has pledged to FNB all of the outstanding stock of Sew Simple.

2. Opelika has pledged to FNB 75,000 shares of stock of Hickory Furniture Company, a Delaware Corporation whose stock is traded over-the-counter.

3. FNB has a security interest in Opelika's machinery, equipment and accounts receivable pursuant to a valid and enforceable security agreement.

4. Sew Simple has guaranteed payment of Opelika's liabilities and obligations to FNB pursuant to a written guarantee executed November 28, 1984.

5. To secure its guarantee, Sew Simple granted FNB a security interest in substantially all of its assets pursuant to a valid and enforceable security agreement dated November 28, 1984 and a valid and enforceable trademark and patent security agreement also dated November 28, 1984.

6. On November 28, 1984, FNB entered into an agreement with Opelika and Technical Equipment Leasing Corporation ("TELCO") referred to in these proceedings as the "Put Agreement." TELCO, a Delaware corporation, owns approximately 66% of the outstanding stock of Opelika. The Put Agreement basically provides that if Opelika defaults under the notes and FNB offers the Sew Simple and Hickory Furniture stock at a U.C.C. sale, TELCO will bid for and purchase the pledged stock for a price equal to the unpaid obligations of Opelika to FNB under the notes.[4]

In the motion *sub judice*, FNB seeks to have the automatic stay imposed by § 362(a) modified pursuant to § 362(d)[5] in order to allow it to proceed with a U.C.C. sale of the Sew Simple and Hickory Furniture stock (the "pledged stock"). FNB argues that under the unique circumstances of this case resulting from the Put Agree-

---

1. Unless otherwise noted, all future references to statute sections will be to Title 11.

2. No party has supplied the Court with an exact total of the current indebtedness or a daily accrual figure for interest.

3. To date, no party has objected to the validity or enforceability of the various security agreements and collateral assignments executed by Opelika and Sew Simple in favor of FNB. This Court has entered an Order setting October 17, 1986 as the last date for filing such objections. In its answer to FNB's motion, Opelika admits the validity and enforceability of FNB's various security interests and collateral assignments. For purposes of this Memorandum Opinion, the Court assumes that these security interests and collateral assignments are valid and enforceable. This Opinion, however, does not preclude the Court from reconsidering this point should a party-in-interest, other than Opelika, file an objection to FNB's secured status on or prior to October 17, 1986.

4. FNB has filed a separate adversary case in these proceedings seeking a declaratory judgment as to the enforceability of the Put Agreement. TELCO has objected to the complaint on jurisdictional and justiciability grounds. That adversary proceeding, however, is not before the Court on the instant motion and the issues involved therein must wait for another day.

5. Contrary to the assertions of Opelika, FNB's written motion for relief from the automatic stay is framed in broad terms under § 362(d), not merely § 362(d)(2). It is obvious from the pleadings, hearings and argument of counsel that FNB is seeking relief under either or both § 362(d)(1) and § 362(d)(2).

ment, cause exists under § 362(d)(1) for this Court to modify the stay. Additionally, FNB argues that Opelika has no equity in the pledged stock and that the pledged stock is not necessary for the effective reorganization of Opelika. Therefore, FNB asserts that it is also entitled to relief from the stay under § 362(d)(2).

Opelika opposes the motion asserting that cause, as used in § 362(d)(1), does not exist. Opelika's position is that the Put Agreement is irrelevant to the Court's decision under § 362(d)(1) and should not be considered as a "cause" to lift the stay. Additionally, Opelika asserts that it has equity in the pledged stock and, although it admits that the Hickory Furniture stock is not necessary for the effective reorganization of Opelika, it argues that the Sew Simple stock is essential to an effective reorganization of Opelika.

The Committee asserts a middle ground, arguing that the stay should be lifted for cause under § 362(d)(1) to allow FNB to hold a U.C.C. sale on the stock. The Committee argues, however, that the stay should only be modified to the extent necessary to permit the sale of the pledged stock at a price not less than the total outstanding balance of FNB's indebtedness.

At the hearing on FNB's motion, the testimony and evidence presented was primarily focused on what value the Court should assign to the Sew Simple and Hickory Furniture stock. The evidence and testimony and the weight given it by the Court will be discussed *infra* where relevant.

## II. DISCUSSION

■ A motion to modify the automatic stay under § 362 is a core proceeding and a bankruptcy court has jurisdiction to enter an order granting or denying the motion. *Hillyard Farms v. White County Bank,* 52 B.R. 1015, 1017 (S.D.Ill.1985); 28 U.S.C. §§ 157(b)(1) and 157(b)(2)(G).

Section 362(d) provides:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d). Thus, a party is entitled to relief from the automatic stay granted a debtor under § 362(a) for cause or, with respect to action against property of the debtor, if the debtor has no equity in the property and the property sought is not necessary for an effective reorganization of the debtor. A bankruptcy court may modify the § 362(a) stay for either or both of the above reasons and such modification may be conditioned as the court deems just under the particular circumstances of the case. 2 Collier on Bankruptcy ¶ 367.02 at 362–42 (15th ed. 1985). The Court will first consider FNB's motion in the context of § 362(d)(2).

## A. SECTION 362(d)(2)

Section 362(d)(2) requires the Court to lift or modify the stay with respect to an action against property of the estate if the debtor does not have an equity in the property and the property is not necessary for an effective reorganization of the debtor. Section 362(g)(1) provides that the party seeking relief from the stay has the burden of proof on the issue of the debtor's equity in the property. If the party seeking relief from the stay does not establish by a preponderance of the evidence that the debtor lacks equity in the property, the movant is not entitled to the relief requested as it has failed to establish its statutory burden of proof. *Klanish v. Penn Furniture Co.,* 56 B.R. 184, 186 (Bankr.W.D.Pa.1986).

Section 362(g)(1) basically requires a secured creditor to show that it is underse-

cured. In order to accomplish that, a secured creditor must show that the value of its entire security package is less than the debt due. If not, the debtor clearly has equity in the property and the creditor is precluded from receiving relief under § 362(d)(2).

FNB has a package of security for its loans to Opelika. This package includes not only the pledged stock, but various security interests in other assets of Opelika and Sew Simple. In determining whether Opelika has equity in the property under § 362(d)(2)(A), the Court must consider the entire security package, not just a portion thereof.

■ FNB did not present nor cite any evidence regarding the value of its collateral apart from the pledged stock. The Court is cognizant of the fact that FNB's security position is a second position behind Opelika's primary lender, Congress Financial. No evidence has been presented, however, as to the amount of Congress Financial's first position or the value of the assets securing Congress Financial. From the record before it, it is impossible for the Court to determine the value of FNB's security interests in the assets of Opelika and Sew Simple. Based on the evidence before the Court, the Court would be precluded from granting FNB relief under § 362(d)(2) even if, arguendo, the Court were to find that the Sew Simple and Hickory Furniture Stock had a value of only $1.00. Since the Court cannot determine whether FNB's second position in the assets of Sew Simple and Opelika provide FNB adequate protection, FNB's motion for relief from the stay premised on § 362(d)(2) is denied.

### B. SECTION 362(d)(1)

■ The Bankruptcy Code does not define what constitutes "cause" under § 362(d)(1) other than to say that "cause" includes "lack of adequate protection." Lack of adequate protection, however, is not the "cause" for which FNB seeks relief from the automatic stay.[6] FNB asserts that "cause" under § 362(d)(1) exists in this case because of the unusual circumstances occasioned by the existence of the Put Agreement with TELCO.

■ The legislative history of § 362(d)(1) does not offer the Court much guidance under the circumstances of this case. It refers primarily to when it would be proper to allow a proceeding to go forward in other forums. *See*, H.R. No. 95–595, 95th Cong., 1st Sess. (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 6300; *See also, Matter of Holtkamp*, 669 F.2d 505 (7th Cir.1982) (affirming bankruptcy court decision that cause existed to allow a personal injury suit to go forward in another forum). A guideline for what constitutes "cause", other than lack of adequate protection, is stated by Judge Ginsberg in his text on bankruptcy:

> Thus, in general, a creditor can seek to have the stay lifted for cause when it is hurt by the stay and when the stay is not required to protect the debtor against the action proposed and that lifting the stay will not enable one creditor to secure an advantage over the debtor's other creditors. However, when adequate protection is not in issue, it is not enough for the creditor to merely show that it will be hurt by the continuation of the stay; it must show that neither the debtor nor the other creditors will be injured if the stay is lifted.

Ginsberg, *Bankruptcy*, ¶ 3306 (1985). Cause to lift the stay exists when the stay harms the creditor and lifting the stay will not unjustly harm the debtor or other creditors.

---

**6.** The Committee in its memoranda urges the Court to modify the stay because FNB is not adequately protected. This position is not pursued by FNB. The Court agrees with Opelika that although the Court allowed the Committee to intervene in these proceedings to protect the interest of the unsecured creditors, it did not grant the Committee authority to prosecute actions on behalf of FNB and the Committee has no standing to do so. Since FNB has chosen not to pursue lack of adequate protection as a cause for lifting the stay, the Committee cannot do so on behalf of FNB and the issue is not before the Court.

■ Often, the lifting or not lifting of the stay will impose some degree of hardship on one or more of the parties involved. In determining whether or not cause exists, the bankruptcy court must balance the inherent hardships on all parties and base its decision on the degree of hardship and the overall goals of the Bankruptcy Code. *In re Groundhog Mountain Corp.*, 4 C.B.C. 387, 392 (Bankr.S.D.N.Y.1975). In considering whether "cause" exists to modify the stay, the Court must look at the totality of the circumstances, e.g., the existence of the Put Agreement in this case. *See Matter of Baptist Medical Center of New York, Inc.*, 52 B.R. 417, 425 (E.D.N.Y.1985) *aff'd* 781 F.2d 973 (2nd Cir.1986). As in any situation where a balancing of hardships is involved, the solution is not always clear-cut.

■ FNB argues that cause to lift the stay exists because of the Put Agreement. Under FNB's theory, if the Court were to lift the stay to allow FNB to proceed with the U.C.C. sale of the pledged stock, all parties would benefit. The FNB scenario is: FNB would offer the pledged stock for sale; TELCO, under the terms of the Put Agreement, would purchase the pledged stock for the entire outstanding balance of Opelika's indebtedness to FNB; unsecured creditors and Opelika would benefit as a result of the extinguishment of Opelika's debt to FNB without stripping Opelika of any operating assets.

The Committee agrees with FNB to a certain extent. The Committee argues that if TELCO were to purchase the pledged stock for an amount equal to the entire outstanding obligations of Opelika to FNB, the debtor, the debtor's creditors, and FNB would all benefit for the same reasons put forth by FNB. The Committee, therefore, agrees with FNB that cause exists to lift the stay. The Committee urges, however, that any order lifting the stay to permit the sale of the stock ought to require that the purchase price of the stock at the sale be no less than the entire outstanding balance of the FNB debt.

Opelika argues that in order for cause to exist, the value of the pledged stock would necessarily have to be less than FNB's claim. Otherwise, Opelika insists, the sale of the pledged stock would be for less than its real value and would represent a squandering of the debtor's assets. The Court agrees with Opelika on this point. If the value of the pledged stock exceeds the amount of Opelika's indebtedness to FNB, cause to lift the stay would not exist since the detriment or hardship borne by the debtor and the debtor's estate would outweigh any benefit to FNB. Therefore, the balance of the equities would weigh in favor of Opelika and cause would not exist to lift the stay.

## III. THE VALUE OF THE PLEDGED STOCK

■ The pledged stock consists of 75,000 shares of Hickory Furniture stock and 100% of the stock of Sew Simple. The value of each must be determined based on the evidence before the Court and the application of different factors.

Hickory Furniture is a closely-held corporation whose stock is traded on the over-the-counter market. The testimony at the hearings revealed that 90% of the stock of Hickory Furniture is owned by the management of the company. TELCO itself owns more than 80% of the stock of Hickory Furniture. Therefore, Opelika's minority position in Hickory Furniture represents less than 10% of the total shares outstanding. In 1985, approximately 6,000 shares of Hickory Furniture stock traded over-the-counter in small blocks of 100 shares or less. The price at that time was $23 bid and $25 asked.

Opelika argues that the value of the stock is thus $24 a share so that the total value of its 75,000 shares of Hickory Furniture stock is $1,800,000 ($24 × 75,000). Opelika's position, however, completely ignores the reality of the situation. Stanley Popeil, called as an expert witness on behalf of FNB,[7] testified that such a large

---

7. Mr. Popeil is a Vice-President of Lewis R.

Eisner and Co. ("Eisner and Co."), which com-

block of stock representing a minority position in a closely-held company would trade at a very substantial discount. He suggested that a 50% to 60% discount would be appropriate in this case. Opelika did not offer any evidence to the contrary. Therefore, the Court accepts Mr. Popeil's expert testimony on this issue and finds that the Hickory Furniture stock has a value of $900,000 (50% × $1,800,000).

The valuation of the Sew Simple stock is more complex than the valuation of the Hickory Furniture stock. The vast majority of the nearly 12 hours of hearings was devoted to this subject consisting, for the most part, of expert testimony.

■ Rule 702, Fed.R.Evid., provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The rule allows for the admissibility of expert testimony to aid the Court in understanding the evidence or deciding an issue of fact. Rule 702, however, does not make the testimony of the expert, even if uncontradicted by another expert, conclusive as to the issue testified to. *Security First National Bank of L.A. v. Lutz*, 322 F.2d 348, 355 (9th Cir.1963). The Court is free to make its own determination of the issues, regardless of the expert testimony. "The rule [Rule 702] does not mean that the trier of fact must rely upon expert testimony which is unsatisfactory or that the trier of fact is precluded from making an independent determination of the facts, regardless of how complicated or 'specialized' the subject matter may be." *Parents in Action v. Hannon*, 506 F.Supp. 831, 836 n. 3 (N.D.Ill.1980).

Popeil also testified as to the value of Sew Simple. He had prepared a valuation report on Sew Simple which report was admitted into evidence. The report, about which Popeil testified at length, contained a narrative as to the business of Sew Simple and an evaluation of the prospects of Sew Simple. The report concluded that Sew Simple had a value of $365,000 as of March 29, 1986.

In arriving at this number, Popeil made use of four different analytical techniques: liquidation value, discounted present value, present value of future earnings, and a method based on royalty payments. In each calculation, he assumed several factors, i.e., future earnings, gross profit margins, discount rates, price earnings multiplier, and the tax rate applicable to Sew Simple.

Popeil also testified that subsequent to preparation of his report, certain events happened that changed his valuation, primarily the settlement of the Burton, Noonan litigation. The settlement of the Burton, Noonan litigation relieved Sew Simple of a large debt to Messrs. Burton and Noonan affecting both the liquidation value and the discounted present value of Sew Simple. The following table reflects Popeil's expert opinion as to the current value of Sew Simple:

**TABLE I**

| | |
|---|---|
| Liquidation Value | $ 722,000 |
| Discounted Present Value | 1,151,000 |
| Present Value of Future Earnings | 390,000 |
| Royalty Method | 252,000 |
| | $2,515,000 |
| | divided by 4 |
| Value of Sew Simple | $ 628,750 [8] |

Opelika argues that several of Popeil's assumptions are just plain wrong and that his methodology is flawed. The Court

pany had been previously retained with Court approval to prepare an analysis of the viability of Opelika and Sew Simple. Popeil was the primary individual at Eisner and Co. responsible for valuation of the assets. Popeil was duly qualified as an expert witness without objection.

8. Popeil testified that the new value would be approximately $630,000. The Court used the numbers supplied by Popeil in his testimony and did its own computation.

agrees that several of Popeil's assumptions are not based on the best available information and his methodology, at times, lacks good business judgment. Popeil himself testified that many factors which go into arriving at the calculations are subjective.

■ The first factor which the Court agrees needs adjustment is the discount factor used by Popeil in his calculations. The discount factor is the method by which future estimates are brought back to present value based on an assessment of the risks involved. Popeil used an admittedly high discount factor of 20% citing the following reasons:

1. Bankruptcy
2. No growth prospects
3. An increasingly obsolete product line due to lack of research and development spending
4. Heavy competition
5. No significant protection from its present patents.

Report at 36.

Mr. Glenn Dalhart, a partner in the accounting firm of Ernst and Whinney, was called as an expert on behalf of Opelika. Dalhart is the regional manager for Ernst, and Whinney's corporate planning and development consulting practice and in that capacity has been called upon to value at least 20 companies over the past five years. By stipulation, Dalhart qualified as an expert for the purpose of testifying as to the methods of valuing businesses. He testified that typical discount rates in valuing companies in today's environment would range from eleven to eighteen percent and that a discount rate of 20% is unrealistic in today's business climate.

Opelika also presented evidence that the real picture at Sew Simple is not as bleak as that painted by Popeil. With respect to the factors Popeil took into account in arriving at his discount factor of 20%, the testimony of Cecil Eggert, President and Chief Operating Officer of Sew Simple, and Lee Mortenson, President and Chief Operating Officer of Opelika and a Director of Sew Simple, shows that: 1) Sew Simple does have some reasonable expectations of growth; 2) although there is competition, it is not as "heavy" as Popeil assumes; 3) with the settlement of the Burton, Noonan litigation, Sew Simple's patents are better protected; and 4) the Sew Simple product line is not obsolete and, in fact, in some areas, is state-of-the-art.

On the basis of the testimony and evidence presented by Messrs. Dalhart, Eggert, and Mortenson, the Court concludes the appropriate discount rate to use is 16%, which is still at the upper end of the scale (recognizing that Sew Simple is not a blue chip company).

■ The second valuation factor the Court cannot accept is Popeil's use of a royalty method. By Popeil's own admission, this method has nothing to do with the other assets of Sew Simple and is merely based on projected royalty fees Sew Simple would receive if Sew Simple let third parties use the patents over a ten-year period and received a 3% royalty fee. This method ignores completely the assets of Sew Simple, other than its patents, thereby assigning them a zero value. The Court finds no reason to include this method in determining a value for Sew Simple, much less assign it equal weight with the other methods.

■ A more appropriate and accepted gauge of a company's value is derived by using a discounted cash flow analysis as described by Dalhart, rather than Popeil's capitalized future earnings. Therefore, the Court will add back an annual $175,000 patent amortization expense incurred by Sew Simple, total the cash flow (net profit plus patent amortization) over the five-year period, add in the residual value of Sew Simple at the end of the fifth year, and discount it back to present value using a 16% discount factor.

Moreover, the Court concludes that each of the three remaining methods, i.e., liquidation value, discounted present value, and discounted cash flow, should not be given equal weight. The preponderance of the

testimony demonstrates that Sew Simple has a very good chance of surviving in the future. According the liquidation value the same weight as the other values would thus be inappropriate. The Court finds that the appropriate weight to be assigned to the three factors are: 10% to the liquidating value; 45% to the Discounted Present Value of the 1990 Book Value; and 45% to the Discounted Cash Flow Method.

Although Opelika urges the Court to make additional adjustments to Popeil's calculations, the Court is not persuaded that additional adjustments are called for.

First, Opelika asserts that a higher gross margin should be used rather than the 21.2% gross margin rate used by Popeil. Opelika's position is based on the fact that for the last four months Sew Simple has been operating at a 30% gross profit margin level. However, Popeil's figure is based on the historical performance of Sew Simple over a longer period. Therefore, the Court believes that the 21.2% gross margin figure is more appropriate.

Opelika also urges the Court to utilize what it alleges is a $125,000 tax-loss carry-forward resulting from Sew Simple's estimated $125,000 net loss for fiscal 1986. Opelika has not provided the Court with information on how the $125,000 loss could or should be applied against Sew Simple's future earnings. For example, testimony at the hearings revealed that Opelika bears a substantial amount of Sew Simple's administrative expenses. Ordinarily, these expenses would be incurred by the operating company, but in this case Opelika performs the work (i.e., bookkeeping and accounting services, the salary of Eggert) without charging these expenses to Sew Simple. The court concludes that any potential benefit of the tax-loss carryforward could be counterbalanced by all of the administrative expenses of Sew Simple which are paid for by Opelika. Therefore, the tax-loss carryforward must be disregarded.

Based on the foregoing adjustments to Popeil's methods, the value of Sew Simple is as follows:

1. Liquidation Value

| | |
|---|---|
| Liquidation Value of Assets | $1,479,400 |
| Liabilities | 616,864 [9] |
| Liquidation Value: | $ 862,536 |

2. Discounted Present Value of 1990 Book Value

| | |
|---|---|
| Book Value as of 3/29/86 after eliminating Burton, Noonan debt | $2,073,069 |
| Add Net Profit (Loss) for: | |
| 1986 | (125,000) |
| 1987 | 115,600 |
| 1988 | 115,600 |
| 1989 | 115,600 |
| 1990 | 115,600 |
| Book Value at 1990 | $2,410,469 |
| Discounted back to 1986 using 16% discount rate | $1,331,281 |

3. Discounted Cash Flow Method

NET PROFIT PLUS AMORTIZATION

| 1986 | 1987 | 1988 | 1989 | 1990 |
|---|---|---|---|---|
| $50,000 | $290,600 | $290,600 | $290,600 | $290,600 |

9. This figure was arrived at by taking Sew Simple's stated liabilities of $1,425,106 and subtracting out all liabilities due Burton and Noonan, since that litigation has been settled.

Residual value at end of 1990 using 7× earnings price multiplier: $809,200

Present value of future cash flow using 16% discount rate:

| 1986 | | 1987 | | 1988 | | 1989 | | 1990 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| $50,000 | + | $250,517 | + | $215,963 | + | $186,175 | + | $607,410 | = | $1,310,065 |

4. Summary

| | | Amount | Weight | Value |
|---|---|---|---|---|
| 1. | Liquidation Value | $ 862,536 | 10% | $ 86,254 |
| 2. | Present Value of 1990 Book Value | $1,331,281 | 45% | 599,076 |
| 3. | Discounted Cash Flow | 1,310,065 | 45% | 589,529 |
| | Value of Sew Simple: | | | $1,274,859 |
| | Value of Sew Simple Stock: | | | $1,274,859 |
| | Value of Hickory Stock: | | | 900,000 |
| | Value of Pledged Stock | | | $2,174,859 |

---

## IV. CONCLUSION

The Court finds that the value of the pledged stock is $2,174,859. This is significantly less than the $2.4 to $2.5 million debt owed by Opelika to FNB. A sale of the pledged stock for the entire amount of all indebtedness due FNB would represent a sale of the debtor's assets for substantially more than they are worth. It would also release the liens of FNB on the assets of Opelika and Sew Simple. Therefore, such a sale would be beneficial to the debtor's estate. The Court is of the opinion that under these unique circumstances, cause exists to lift the stay.

The Court will enter an order lifting the stay to allow FNB to proceed with a U.C.C. sale of the pledged stock. The order is entered pursuant to § 362(d)(1) for cause. The order provides that any sale must be for the full amount of all of Opelika's indebtedness to FNB. If the Put Agreement is honored by TELCO, assets worth $2,174,-859 will be sold for approximately $2,450,-000 representing a $275,141 gain for the estate. The sale will also relieve the Sew Simple estate from its contingent liability to FNB resulting from its guarantee of Opelika's indebtedness as well as release the liens of FNB on the assets of Sew Simple and Opelika.

Opelika argues that allowing the sale to go forward would deprive Opelika and Sew Simple of the benefits each receive from operating in a parent/subsidiary relationship. This is not a realistic concern. Opelika is 66% owned by TELCO. If TELCO were to purchase the Sew Simple stock at a U.C.C. sale, it is not unreasonable that TELCO would allow Opelika and Sew Simple to continue to operate closely together. If TELCO does not honor the Put Agreement, it is very unlikely that anyone else would bid the entire amount of Opelika indebtedness to FNB.

Mr. Mortenson testified that he is the President and Chief Executive Officer of Opelika and the President and Chief Operating Officer of TELCO. He is also a director of Sew Simple. It would defy common sense for Mr. Mortenson to eliminate any beneficial operating synergism between Opelika and Sew Simple merely because TELCO owns the stock of Sew Simple directly rather than indirectly. In the event TELCO were to purchase the stock of Sew Simple at the U.C.C. sale, the management of Opelika and Sew Simple would still be able to operate closely together.

454

In conclusion, the Court finds that cause under § 362(d)(1) exists to lift the stay to allow FNB to proceed with a U.C.C. sale of the pledged stock. Cause exists as a result of the unique circumstances surrounding the Put Agreement and the fact that the value of the pledged stock is significantly less than the indebtedness owed by Opelika to FNB. However, the order lifting the stay is conditioned to the extent that FNB will not be allowed to sell the pledged stock for less than the entire amount of the outstanding indebtedness, including all costs due FNB from Opelika.

THEREFORE, IT IS HEREBY ORDERED that FNB's motion to lift the automatic stay in order to proceed with a sale in accordance with the requirements of the U.C.C. of 75,000 shares of Hickory Furniture stock and 100% of the stock of Sew Simple stock is granted.

IT IS FURTHER ORDERED that FNB is prohibited from accepting at said sale any bid which is less than the total amount of all outstanding indebtedness, including costs, of Opelika to FNB.