**In re Walter ASCHER, Debtor.**

**Bankruptcy No. 90 B 10559.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

Oct. 23, 1992.

See also 141 B.R. 652.

Zachary M. Bravos, Bravos & Trapp, Wheaton, Ill., for debtor.

Donald C. Shine, Kristen E. Crisp, Nisen & Elliott, Chicago, Ill., for Michael Brogan, Edward Long, and James Kelly.

David E. Grochocinski, Grochocinski & Grochocinski, Palos Hills, Ill., trustee.

Kevin William Bloese, Vescelus Powell & Stock, Wheaton, Ill., for Dorothy Schauwecker.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

Michael Brogan, Edward Long, and James Kelly (the "Movants") moved for relief from the automatic stay pursuant to 11 U.S.C. § 362(d). They seek to remain in possession of the commercial laundry facility located in Harvard, Illinois, doing business as Royal Laundry Systems, in order to realize the value of their security interest. This motion was consolidated for trial with two Adversary matters, *All–American Laundry Service, Inc. et al. v. First State Bank of Harvard, et al.,* and *Schauwecker v. Ascher,* 141 B.R. 652 (Bkrtcy.N.D.Ill. 1992). The motion was opposed by the Debtor Walter Ascher ("Ascher") and the Chapter 11 Trustee David Grochocinski. At trial, the Movants, Ascher, and the Trustee all presented exhibits and witnesses in support of their positions. Counsel for Dorothy Schauwecker also attended the trial and cross-examined certain witnesses. Schauwecker is on record as opposing this motion. Having considered the evidence, arguments of counsel, and all submissions in the record, the Court now makes and enters the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. All–American Laundry Service, Inc. ("All–American") was formed as a Corpora-

tion under Illinois law in 1988 for the purpose of acquiring the assets of Royal Laundry Systems ("Royal") and operating Royal's commercial laundry facility in Harvard, Illinois (the "Laundry"). Ascher was the president of All–American, and he also claims to be the company's sole shareholder.[1]

*Calculation of Movant's Secured Claim*

2. As evidenced by an installment note dated June 18, 1988, the Commercial National Bank of Berwyn (the "Bank") lent All–American $668,000 for use in financing the acquisition of Royal's assets. Ascher signed the note as president of All–American. The funds were disbursed by the Bank on June 27, 1988 and paid to Royal's principals.

3. For collateral, the Bank took a security interest in all of Royal's assets, including fixtures, equipment, inventory, accounts receivables, all after-acquired property. Since All–American was purchasing the real property where Royal was located, the Bank also took a trust deed on that property. Ascher further pledged 30,000 shares of stock in All–American and 10,247 shares of common stock in United Parcel Service of America, Inc. The All–American stock consisted of one stock certificate which lists Ascher as the owner of 30,000 shares. The UPS stock was provided by Movants who owned these shares.

4. Security agreements were signed between the Bank, All–American, and "Walter Ascher d/b/a Royal Laundry Systems". UCC Statements from All–American and Ascher were filed with the Illinois Secretary of State and the McHenry County Recorder of Deeds in July 1988. The trust deed was also recorded, and the Bank took the shares of stock into its possession. Thus, the Bank's security interest in all this property was duly perfected shortly after the loan was made.

5. The note provided for twelve monthly payments on principal of $9,201.70 plus interest accruing at the rate of 2% above prime rate with the balance of principal and accrued interest due one year later (June 18, 1989). The note also provided that post-maturity interest would accrue at 11% above prime rate until the balance due was fully paid, but no provision was made for a different interest rate in the event of a default by the borrower. Finally, the borrower agreed "to pay reasonable attorneys fees, costs and expenses incurred by Lender in collection and enforcement of this Note." Movant's Ex. M–2.

6. In the fall of 1989, the loan was in default, and the Bank took steps to sell the UPS stock. Movants became aware of these efforts and acted to prevent such a sale from happening. Consequently, Movants purchased the note from the Bank on December 13, 1989 for the balance due which was $625,000 ($580,625.90 of principal, $38,950.53 of accrued interest, and $5,423.57 in other charges). In consideration for this payment, the Bank assigned the note and security interests to Movants and their nominee, Laundry Credit Corporation. This assignment was then duly recorded.

7. The parties have stipulated that, as of petition date, the principal due on the note equalled $625,000. While the parties differ on what rate to apply in calculating interest, they stipulate that in the event that Movants are correct in applying the contract post-maturity rate of 11% above prime, then interest accrued as of this date is $347,196. The parties have further stipulated that in the event that the Trustee is correct in applying the pre-maturity rate of 2% above prime, then interest accrued as of this date is $184,416.69.

8. The Trustee claims that the amount of interest due must be offset by $132,862.50 to account for payments made to Laundry Credit Corporation out of the income from the operation of the Laundry while Movants were in possession of it. However, these funds were only used to finance the continuing operation of the

---

**1.** Ownership of All–American's stock is disputed, and this issue is the subject of the two Adversary Complaints (90 A 702 and 90 A 753) filed by the Movants and Dorothy Schauwecker. Trial on these Adversaries has been recessed until April 1, 1993. Therefore, this dispute will not be addressed or decided in these Findings.

Laundry and were not paid out as dividends to the Movants. Therefore, this claim has no merit.

9. The Trustee and Debtor further argue that the indebtedness should be reduced by $110,000 to account for a certificate of deposit that was owned by Ascher and allegedly pledged as security to the note. However, this pledge is not recorded as a security interest on the note, and the Bank never accepted Ascher's attempt to apply this certificate of deposit to the note. Mr. James Muchow, a vice-president at the Bank, testified that Ascher owed a substantial sum in excess of this note and that the Bank applied that certificate of deposit to another loan. The evidence shows that the Bank did not act wrongfully or in violation of any contract when it did this.

10. Movants claim to have expended $130,000 in attorney's fees in attempting to enforce and collect on the note. The Trustee and Debtor dispute this figure, but all parties have stipulated that $5,000 would constitute reasonable attorneys' fees for services in setting up a sale of the collateral listed in the note pursuant to guidelines provided in the Uniform Commercial Code.

11. Movants took physical possession of the Laundry and ousted Ascher on September 5, 1989. They have remained in control and possession of the Laundry ever since.

12. After Movants took control and possession of the Laundry, they discovered that its bank account did not contain sufficient funds to cover the payroll for the Laundry's employees. Therefore, Mr. Brogan wired $12,010 into the Laundry's account to cover this shortfall. Movants' Ex. M–16.

13. Mr. Brogan also wrote several other checks, totalling $29,347.43, which were spent in the operation and preservation of the Laundry. A $25,290.43 check was written to Royal Laundry Systems, dated June 12, 1990, which was used to finance the operation of the laundry. A $2,940 check was written to Kenneth Chadwick, dated December 20, 1989, to for accounting services provided to the Laundry, and two checks totalling $1,117, dated January 7, 1991 and April 28, 1991, were written to Steve Brogan for bonuses to his salary which he received for being the accounts payable and accounts receivable clerk. *Id.*

14. Therefore, the total secured debt owed to Movants is either $855,774.12 or $1,018,553.43, depending on whether one accepts the Trustee's or the Movants' theory on which interest rate to apply to the balance due.

### Calculation of the Laundry's Value

15. Expert testimony was offered as to the value of the Laundry. The net capitalized earnings (or discounted cash flow) is found to be the proper approach to determining value of the Laundry, because it is a going entity and is expected to remain as such by all the Parties to this litigation. Under this approach, the valuation is conducted by predicting the future earnings for the company, and then discounting those earnings by a capitalization (or discount) rate which is the rate of return required by a potential investor in order for his or her investment to be worthwhile. The following formula is applied to reach a prediction as to value:

$$\frac{Predicted\ earnings\ per\ year}{Capitalization\ rate} = \text{Value of Company's future net earnings to investors}$$

16. The Laundry is currently controlled through the Laundry Credit Corporation which is an Illinois corporation wholly owned by Movants. Management and sales services are provided by Mr. John Eakes, a principal of Royal (the Laundry's former owner) and his subordinates through an agreement with Professional Laundry Service Consultants, Inc., an Illinois corporation owned by Mr. Eakes. Mr.

Eakes was hired because Movants' only business experience related to their jobs as executives at UPS, and they needed a person with experience in the commercial laundry industry to manage the Laundry. The management fees paid to Mr. Eakes and Professional Laundry Service Consultants are a reasonable and necessary component of the Laundry's expenses, and would be paid by a future investor.

17. The Movants also hired Mr. Brogan's son Steve to work at the Laundry as accounts payable and receivables clerk at a salary of about $36,000 a year. The Trustee and Debtor maintain that his salary is excessive and that his salary expenses cannot be attributable to the business in calculating its net profits. However, since these parties presented insufficient evidence by which the Court could judge the reasonableness of Steve's salary, this argument was not established.

18. The Management fees and Steve Brogan's salary shall be attributed to the business in calculating net profits. Management fees represent the costs of retaining competent management for the business, and Steve Brogan's salary represents the cost of keeping an owner's agent on the premises who has undivided loyalty to the owner. A future owner-manager might not need such agents, but owner-managers represent only a portion of the potential investors who could buy the Laundry. Thus, the assumption of management fees and on-site agent salary costs are necessary to find the real value of the laundry to potential investors.

19. Debtor further asks the Court to discount non-cash expenses, such as depreciation, when calculating the Laundry's net profits. The equipment used in the Laundry's operation wears down and needs to be replaced periodically, and depreciation accounts for this real cost of doing business. Thus, an accounting of profits without any provision for depreciation is, in effect, borrowing against the company's future. Since it is not rational to assume that any future investor would desire to run the business into the ground in an effort to maximize his first year's profits, Debtor's argument is rejected.

20. Annualizing the Laundry's net profits for the first half of 1992 (at $181,464) provides the most accurate basis for prediction of the Laundry's future earnings potential. This conclusion is made for several reasons:

a. In the first six months of 1992 the Laundry netted $90,732. The evidence shows that this figure is representative of the whole year.

b. The net earnings history of the Laundry is as follows: In 1990, the Laundry lost $58,754. In 1991, the Laundry lost $4,973. However, the Laundry was in a state of upheaval from 1989 to 1991. Management had changed hands several times, and several customers were lost. The business had only recovered to a stable condition in the latter half of 1991. Prior to the sale of the business in late 1988, the Laundry netted annual profits around $450,000.

c. Mr. Eakes testified that the Laundry is currently operating at or near capacity and that expenses have been reduced over the past year to an efficient level. Thus, earnings are not likely to increase, and expenses are not likely to decrease, beyond their current levels.

21. The Laundry's business consists of cleaning sheets, towels, and other washable items under contracts with hotels and hospitals. The business faces several risks in its operations:

a. All of the Laundry's business comes from five or six clients, and most of these clients have no contractual relationship with the Laundry itself. They have contracts with Mr. Eakes who then allocates the business to the Laundry. Over two-thirds of the laundry to be processed comes from these contracts with Mr. Eakes. Therefore, any new investor in the Laundry would be dependent on him until new business could be developed.

b. There is a dispute with the Internal Revenue Service over allegedly unpaid payroll taxes in the amount of $203,630. While this problem has not reached

a critical stage, this threat of liability is apparently still outstanding.

c. The Laundry is likely to incur new expenses as a result of new regulations promulgated by the Occupational Safety and Health Administration which will require the laundry workers to wear protective clothing to prevent the spread of AIDS and hepatitis.

d. The local water supply contains a high iron content which occasionally causes rust-colored stains to appear on the processed laundry. An iron-removal system was installed by the Movants, but the problem has returned intermittently, and limits the Laundry's efforts to compete for certain clients. Related to this iron problem is a dispute over unpaid bills with the Village of Harvard which provides the water. An unpaid municipal water bill of $69,050 is currently outstanding. This dispute has not been formally settled, but Mr. Eakes reached an accommodation with the Village which defers the issue and may resolve it.

e. Workmen's Compensation insurance is likely to rise due to increased concern about AIDS and hepatitis. Mr. Eakes testified that the Laundry's current provider has demanded a significant increase in premiums in order to renew its policy.

f. The labor force of the business consists primarily of recent immigrants to this country. In August 1991, the Immigration and Naturalization Service paid the Laundry facility a visit, and half of its workers were taken away. This temporarily disrupted operations, but it did not cause any long term damage. The Laundry was able to replace lost workers quickly, but whether it has potential liability under federal law for hiring illegal aliens is unknown and was not addressed at trial.

g. Other risks may exist concerning environmental problems and possible competition between washable and disposable items. However, the potential liability for these speculative risks has not been quantified.

22. The estimate by the Trustee's expert for the required return for a putative equity investor in the Laundry is reasonable. Such an investor would require a 25% return on the equity investment in order to provide a reasonable profit and compensate for risks inherent in owning this business.

23. The Court further agrees with the Trustee's expert that an acquisition of the Laundry can partly be accomplished with debt financing. This expert found, and the Court agrees, that a lender would finance 45% of the purchase price. Based on this expert's testimony, the Court finds that the required return for this lender would be 12%. Thus, a capitalization rate for this estimation of value would be 19% to 19.5%.[2]

24. Therefore, the Court applies an income estimate of about $180,000 a year and a capitalization rate of 19% to 19.5% to reach a finding of value in the range of $945,000 to $925,000.

25. The above valuation must be discounted by 10% to account for the broker costs, sales expenses, and risks inherent in selling the business. This leaves a net value to the owners, creditors, and estate of $850,500 to $832,500.

26. The Laundry's value is highly uncertain and there is no equity cushion over debt. (See Finding No. 7). Furthermore, the risk that the business value will fluctuate falls most heavily on Movants. Therefore, Movants are not adequately protected by equity cushion, and there is no sugges-

2.

| | | | |
|---|---|---|---|
| Equity return (25%) $\times$ | percentage of (55%) total investment | = | 13.75% |
| Debt return (12%) $\times$ | percentage of (45%) total investment | = | 5.4% |
| | Capitalization Rate | = | 19.15% |

tion that Movants will receive adequate protection payments.

27. Mr. Ascher filed for his petition for relief under Chapter 11 of the Bankruptcy Code on June 8, 1990. On August 1, 1990, he consented to entry of an Order by this Court for appointment of a Chapter 11 Trustee. Mr. David Grochocinski was subsequently appointed. No Plan of Reorganization was proffered at trial, nor is there any indication that a plan is in the offing, other than a liquidated plan.

28. Finding of Facts contained in the Conclusions of Law will stand as Findings of Fact.

## CONCLUSIONS OF LAW

1. This matter is before the Court pursuant to 28 U.S.C. § 157 and is referred to here under Local District Court Rule 2.33. Subject matter jurisdiction lies under 28 U.S.C. § 1334, and this is a core proceeding under 28 U.S.C. § 157(b)(2)(G).

2. Section 362(d) of the Bankruptcy Code provides that the automatic stay may be modified to permit an action against debtor's property when the debtor has no equity in that property, and it is not necessary for an effective reorganization. 11 U.S.C. § 362(d)(2).

3. The Movants have the burden of proving by a preponderance of evidence that Debtor has no equity in the property. 11 U.S.C. § 362(g); *In re Opelika Manufacturing Corp.*, 66 B.R. 444, 447 (Bankr. N.D.Ill.1986). The parties opposing the motion have the burden of proof on all other issues. 11 U.S.C. § 362(g). To establish that the property is necessary to an effective reorganization, Ascher and the Trustee must show that there is "a reasonable possibility of a successful reorganization within a reasonable time." *United Savings Assoc. v. Timbers*, 484 U.S. 365, 376, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988).

4. The Movants have met their burden on the issue of Debtor's equity in the Laundry. The value of the Laundry business as a going entity to the Movants and to the estate is in the range of $850,500 to $832,500, and, even accepting the Trustee's theory on interest rates, the amount owed is $855,774.12. Therefore, Debtor has no equity in the Laundry.

5. Since the payments made by Brogan to fund the payroll and pay other expenses were necessary for the preservation of the Laundry as a going entity, Movants are entitled to recover these funds from the proceeds of the sale of the Laundry under 11 U.S.C. § 506(c). *See In re McKeesport Steel Castings Company*, 799 F.2d 91 (3rd Cir.1986) (allowing a § 506(c) claim for a gas company that supplied natural gas to the debtor's premises where the creditor's collateral was stored during the Chapter 11 proceeding), and *Matter of Reda, Inc.*, 54 B.R. 871, 881 (Bankr.N.D.Ill. 1985) ("an unsecured administration claim creditor who provides a quantifiable benefit to a secured creditor and the estate is entitled to a super priority claim as compensation for its efforts"). With a super priority claim under § 506(c), Movants are entitled to payment of this claim ahead of any other claimant including the Trustee, Ginsberg, *Bankruptcy: Text, Statutes, Rules*, § 10.11[b], and cases cited (2nd Ed. 1991), and this claim may be recovered directly from the property. *Id.* Therefore, the payments made by Brogan, as discussed in the Findings, are included in the calculation of Movant's secured claim against the Debtor's property.

6. There are two issues raised by the parties which do not need to be decided here. First, under the note, the Movants are entitled to recover "reasonable attorneys' fees, costs and expenses incurred by Lender in collection and enforcement of this Note." Movant's Ex. M-2. Movants claim to have expended $130,000 in legal fees in the collection and enforcement of this note. *See* Movants' Ex. M-21 (bills from Movants' law firm). However, this issue was not addressed at this trial. The Court includes the $5,000 stipulation for legal fees for setting up a putative UCC sale as part of the claim, but no finding is made as to the reasonableness of the $130,-000 bill for legal services. The other issue not decided is whether or not to apply the

contract rate for post-maturity interest. Neither issue is addressed because the Debtor has no equity in the Laundry, even if the $130,000 legal bill is not included and the Trustee's arguments as to interest rates are accepted. These issues will be addressed when and if they need to be resolved.

■ 7. The parties opposing the stay have not met their burden to show that a plan of reorganization is reasonably in prospect or that the Laundry would be necessary for Debtor's reorganization. Therefore, Movants are entitled to judgment on the motion to modify the stay.

■ 8. Relief from the stay may be granted by "terminating, annulling, modifying, or conditioning such stay." 11 U.S.C. § 362(d). Therefore, the Court has considerable flexibility to fashion relief that protects the interest of the Movants, Debtor, and the estate. *In re Virginia Hill Partners I,* 110 B.R. 84, 87 (Bankr. N.D.Ga.1989); 2 *Collier on Bankruptcy,* ¶ 362.07 (15th Ed.1992).

## CONCLUSION

The evidence is clearly in favor of the Movants on all issues in this case, and judgment will be entered in their favor on the motion to modify the stay. However, the actual value of the laundry remains uncertain and dependent on what offers the market will bring. In entering an order in this case, the Court has only modified the stay to allow the Movants to sell the Laundry, and several conditions are incorporated into the order to ensure that they make prompt and significant efforts to market and sell the property.